# 14 CV 9068

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

CHRISTOPHER DEPAOLI and KEVIN
MAHER individually and on behalf of those
similarly situated,

*Plaintiff*,

vs.

THE LONDON SILVER MARKET FIXING,
LTD.; DEUTSCHE BANK AG; DEUTSCHE
BANK AMERICAS HOLDING
CORPORATION; DB U.S. FINANCIAL
MARKETS HOLDING CORPORATION;
DEUTSCHE BANK SECURITIES, INC.;
DEUTSCHE BANK TRUST
CORPORATION; DEUTSCHE BANK
TRUST COMPANY AMERICAS;
DEUTSCHE BANK AG, NEW YORK
BRANCH; HSBC HOLDINGS PLC; HSBC
NORTH AMERICA HOLDINGS INC.; HSBC
BANK U.S.A., N.A; HSBC USA INC.; THE
BANK OF NOVA SCOTIA (a/k/a
SCOTIABANK) (a/k/a SCOTIAMOCATTA);
SCOTIABANC INC.; SCOTIA HOLDINGS
(US) INC.; SCOTIA CAPITAL (USA) INC.;
THE BANK OF NOVA SCOTIA TRUST
COMPANY OF NEW YORK, UBS AG; and
JANE DOES 1-100,

*Defendants*.



RECEIVED
NOV 1 3 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................... 2

II.     PARTIES ............................................................................................................... 7

        A.      Plaintiffs ................................................................................................... 7

        B.      Defendants ................................................................................................ 8

                1.      The London Silver Market Fixing, Ltd. ........................................ 8

                2.      Deutsche Bank Defendants ............................................................ 8

                3.      HSBC Defendants ........................................................................ 10

                4.      Scotiabank Defendants ................................................................. 11

                5.      UBS Defendants ........................................................................... 12

                6.      Jane Doe Defendants .................................................................... 13

                7.      Agents and Co-conspirators ......................................................... 14

III.    JURISDICTION, VENUE, AND COMMERCE ................................................. 14

IV.     DEFENDANTS SET THE GLOBAL BENCHMARK PRICE OF SILVER THROUGH
        THE LONDON SILVER FIX DURING THE CLASS PERIOD ................................... 16

V.      THE SILVER FIX SET THE PRICE OF PHYSICAL SILVER AND FINANCIAL
        INSTRUMENTS TIED TO THE PRICE OF PHYSICAL SILVER DURING THE
        CLASS PERIOD ...................................................................................................... 20

        A.      Physical Silver ....................................................................................... 21

        B.      Exchange-Traded Silver Derivatives ..................................................... 22

                1.      COMEX Silver Futures Contracts and Options ........................... 22

                2.      COMEX miNY Silver Futures Contracts ..................................... 25

                3.      NYSE LIFFE Mini Silver Futures Contracts and Options ....................... 26

        C.      Other Financial Instruments ................................................................... 26

                1.      Over the Counter Commodity Swaps ........................................... 26

                2.      Exchange Traded Funds ............................................................... 27

        D.      The Silver Fix Directly Affected the Price of Physical Silver, Silver Futures, and
                Other Silver-Based Derivatives Tied to the Price of Physical Silver during the
                Class Period ........................................................................................... 28

VI.     DEFENDANTS EXPLOITED AND ABUSED THEIR ADVANTAGEOUS POSITION
        AS SILVER FIX PANEL MEMBERS BY ENGAGING IN MANIPULATIVE AND
        COLLUSIVE CONDUCT TO CAUSE ARTIFICIAL SILVER PRICES DURING THE
        CLASS PERIOD ...................................................................................................... 30

        A.      Defendants Abused their Positions As Silver Fix Panel Members By Manipulating
                the Silver Fix to Levels That Did Not Reflect the Legitimate Supply and Demand
                for Silver ................................................................................................ 31

B.      Defendants Used Their Advance Knowledge of the Silver Fixing Results to Establish COMEX Silver Futures Positions During the Silver Fix Before the Results Were Released to the Public .................................................. 32

VII.    GOVERNMENT ENFORCERS HAVE BEEN INVESTIGATING THE SILVER FIX 35

A.      Government Enforcers are Aware that the Silver Market is Open to  Manipulation ........................................................................................................ 35

1.      The CFTC Identified Several Dates With Aberrant Silver Prices During the Class Period.......................................................................... 39

2.      Commercial Silver Traders Are Aware of Manipulation in the Precious Metals Market ...................................................................... 41

B.      Increasing Pressure to Expand Transparency Results in a Revamped Silver Fix. 42

VIII.   THE DEMISE OF THE SILVER FIX............................................................. 43

A.      Under Government Investigation, Deutsche Bank Put its Seat on the Silver Fixing Panel Up for Sale ................................................................................ 43

B.      Deutsche Was Unable to Sell What Should Have Been a Valuable Seat ............ 44

C.      Deutsche Resigned Unable to Sell its Seat ........................................................ 44

D.      The Full Panel Announced it Would Be Disbanding............................................ 45

IX.     THE LONDON SILVER PRICE HAS REPLACED THE SILVER FIX AS THE GLOBAL BENCHMARK PRICE FOR SILVER............................................... 47

A.      Fixing the Fix Between the Announcement and the Closing ............................... 47

1.      The Search for a Replacement Started Almost as Soon as the Announcement That the Silver Fix Was Ending ..................................... 49

a.      The LBMA............................................................................................... 50

2.      After Search and Soliciting Bids, the LBMA Awarded the Replacement for the Fix to CME and Thomson Reuters................................ 51

a.      Consultation ............................................................................................ 51

3.      The LBMA Silver Price Launched on August 15, 2014.......................... 54

4.      The LBMA Methodology ........................................................................ 55

5.      Concerns over the "New Fix".................................................................. 56

X.      ECONOMIC EVIDENCE FURTHER SUPPORTS COLLUSION AND MANIPULATION OF THE SILVER FIX DURING THE CLASS PERIOD ................ 57

A.      Expert Analysis Reveals Systematic Suppression of Spot Market Silver Prices Throughout the Class Period.......................................................................... 57

B.      Expert Analysis Has Identified Anomalous Silver Pricing Behavior at the Time of the Silver Fixing........................................................................................ 80

1.      Silver Prices Consistently Decrease Around the Start of the Silver Fixing ............................................................................................................. 81

2.      Anomalous Spikes in Both Trading Volume and Price Volatility Following the Start of the Silver Fixing Demonstrate Information Leaking to the Market ...................................................................... 87

3.      Informed Traders with Knowledge of the Fix Benefit Financially by Taking Advantage of the Observed Pricing Anomalies .......................... 93

C.      Computer Analysis of COMEX Silver Futures Market Data has Identified Activity Around the Silver Fix Consistent with Informed Trading ...................... 97

XI.     ANY OTHERWISE APPLICABLE STATUES OF LIMITATIONS ARE TOLLED BY DEFENDANTS' ACTIVE AND FRAUDULENT CONCEALMENT ........................ 101

XII.    CLASS ACTION ALLEGATIONS ................................................................. 103

XIII.   CLAIMS FOR RELIEF ................................................................................. 105

FIRST CLAIM FOR RELIEF CONSPIRACY IN UNREASONABLE RESTRAINT OF TRADE: SHERMAN ANTITRUST ACT ......................................... 105

SECOND CLAIM FOR RELIEF CONSPIRACY IN UNREASONABLE RESTRAINT OF TRADE: DONNELLY ANTITRUST ACT ......................................... 106

THIRD CLAIM FOR RELIEF PRICE MANIPULATION:  COMMODITY EXCHANGE ACT ................................................................. 107

FOURTH CLAIM FOR RELIEF PRINCIPAL-AGENT LIABILITY: CEA ............... 109

FIFTH CLAIM FOR RELIEF AIDING AND ABETTING: CEA ................................ 109

SIXTH CLAIM FOR RELIEF UNJUST ENRICHMENT COMMON LAW .............. 110

XIV.    PRAYER FOR RELIEF ................................................................................. 111

A.      Judgment of Violation of the Sherman Antitrust Act ........................................ 111

B.      Standing under the Clayton Antitrust Act ......................................................... 111

C.      Judgment of Violation of the Donnelly Antitrust Act ...................................... 111

D.      Judgment of Violation of the Commodity Exchange Act .................................. 112

E.      Certification of Plaintiff Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure ................................................................................................. 112

F.      Treble Damages ............................................................................................... 112

G.      Punitive Damages ............................................................................................ 112

H.      Disgorgement and Restitution .......................................................................... 112

I.      Costs of Suit .................................................................................................... 112

J.      Pre- and Post-Judgment Interest ..................................................................... 112

K.      Reasonable Attorney's Fees ............................................................................. 112

L.      Other Just and Proper Relief ............................................................................ 113

XV.     DEMAND FOR JURY TRIAL ...................................................................... 113

**Silver is the devil's metal . . . . People look at silver and think it's an easy market.  Those people get carried out on a stretcher.**

—John Levin, HSBC Managing Director of Global Metals Trading
Financial Times Silver Investment Conference
London, June 9, 2010[1]

COMES NOW Plaintiffs Christopher DePaoli and Kevin Maher ("Plaintiffs"), by and through their undersigned counsel, for their Complaint brought under the Sherman Antitrust Act, the Clayton Antitrust Act, the Donnelly Antitrust Act, the Commodity Exchange Act, and the common law of Unjust Enrichment, on behalf of himself and a Class of those similarly situated under Rule 23 of the Federal Rules of Civil Procedure, for treble damages, disgorgement and restitution, and injunctive and other relief, against Defendants, for their violations of law from at least January 1, 1999, through the date on which the effects of Defendants' unlawful conduct cease ("Class Period"), and, upon knowledge, information, belief, and investigation of counsel, alleges:

---

[1] *United Kingdom: Buy and Hold Beats Trading*, TENDERSINFO June 12, 2010.

## I.     NATURE OF THE ACTION

1.      Until very recently, the price of silver was set by a combination of three of the world's largest multinational banks—the members of The London Silver Market Fixing, Ltd. The three banks are Deutsche Bank AG ("Deutsche"), HSBC U.S.A. Bank, N.A. ("HSBC"), and The Bank of Nova Scotia-ScotiaMocatta ("Scotiabank").

2.      The name of the process was the "Silver Fix."  The Silver Fix determined the benchmark price of silver worldwide from 1897 until August 14, 2014.  A "City of London Institution," the Silver Fix played a "crucial role in the roughly $30 billion a year global trade in silver,"[2] although it had "lost its lustre in recent years due to concerns about transparency and vulnerability to manipulation."[3]

3.      Defendants literally fixed the price of silver once per day, every business day.[4] Defendants fixed the price through a secure conference call, at noon, London-time.  There were no outside observers, and Plaintiff is aware of no recordings or transcripts ever released.  No regulatory body oversaw the Silver Fix.  No one except Defendants have first-hand knowledge of what really occurred on the conference calls.

4.      Through this clandestine device, these three Defendants, by their concerted action, dictated the price of physical silver and thereby the prices of silver based derivatives,

---

[2] Press Release, *The new LBMA Silver Price heralds a new era in precious metals benchmarks*, THOMPSON REUTERS (Aug. 5, 2014), http://blog.financial.thomsonreuters.com/new-silver-fix-heralds-new-era-precious-metals-benchmarks/.

[3] *CME and Thomson Reuters to set silver benchmark*, THE FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

[4] A list setting forth the price of each daily Silver Fix during the Class Period up until its demise on August 14, 2014, is appended hereto.

such as silver futures and options, the prices of which are directly and proximately caused by, and directly linked to, the price of physical silver.

5.      U.S. and European authorities are presently investigating the Silver Fix.   In particular, the U.S. Commodity Futures Trading Commission ("CFTC") said last March that it had "started internal discussions on whether the daily setting of gold and silver benchmarks is open to manipulation."[5]   Early last year, CFTC Commissioner, Bart Chilton, was quoted as saying, "We've witnessed blatant and brazen monkeying with the marks.  . . . [T]he idea that pervasive manipulation, or attempted manipulation, is so widespread should make us all query the veracity of the other key marks.  What about the gold and **silver fixes in London** . . . . Why would they be any different in the minds of those that may have sought to push or pull rates?"[6]

6.      These investigations led Deutsche Bank, which had been on the panel for twenty years, to withdraw from the Fix.[7]  Deutsche Bank tried to sell its seat on the panel, but, tellingly, there were no buyers.[8]

7.      In the wake of the pending governmental inquiries, Deutsche Bank's resignation, and with only two panel members left, Defendants announced that they would disband their

---

[5] *How London's gold and silver price benchmarks are 'fixed,'* REUTERS (Jan 17, 2014), http://uk.reuters.com/assets/print?aid=UKBREA0G19J20140117.

[6] *Statement of Commissioner Bart Chilton before the International Roundtable on Financial Benchmarks,* Washington, D.C. (February 26, 2013), http://www.cftc.gov/PressRoom/SpeechesTestimony/chiltonstatement022613 (emphasis added).

[7] *Deutsche resigns gold and silver price-fix seats,* FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html?siteedition=uk#axzz38yxp1nAQ.

[8] *CME and Thomson Reuters to set silver Benchmark,* FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ

combination as of August 14, 2014.[9]   A new process was set to replace the Silver Fix.  "The century-old method of setting silver prices—daily chats among a small coterie of banks—[wa]s being scrapped for something more modern."[10]

8.      In anticipation of the end of the Silver Fix, FORBES quoted Andrew Caminschi, "a researcher at the University of Western Australia and a subject matter expert," to say: "The best part of the London Silver Price Fixing is that it will soon disappear."[11]

9.      Mr. Caminschi, a recognized authority in the field, has conducted an extensive study of the Silver Fix, which outlines "undeniable" collusion and manipulation.[12]   He was interviewed regarding his important study in June 2014 by KITCO NEWS for an article entitled, *Good News -- Silver Fix is Ending*.[13]   The article quoted Caminschi to say about the Fix: "It is statistically undeniable . . . There is this trade advantage that is granted to the fix participants." Caminschi found a statistically significant difference in prices of silver—both physical and futures—in the five minutes before and the five minutes after the noon Silver Fix, accompanied

---

[9] Press Release, *The London Silver Market Fixing Limited* REUTERS (May 14, 2014), at http://www.reuters.com/article/2014/05/14/idUSnMKWWsY3ca+1e8+MKW20140514.

[10] *Bullion Fixes in Flux*, THE WALL STREET JOURNAL (June 18, 2014), http://online.wsj.com/articles/bullion-industry-to-meet-in-july-to-discuss-london-gold-fix-overhaul-1403082075.

[11] *Research Demonstrates Price Suppression During Silver Fixing*, FORBES (July 18, 2014), http://www.forbes.com/sites/kitconews/2014/07/18/research-demonstrates-price-suppression-during-silver-fixing/.

[12] Andrew Caminschi, *Any Silver Linings? London Silver Fixing impact on public markets before and after the introduction of contemporaneous futures trading*, SSRN-id2461098 (July 7, 2014).

[13] *Good News Silver Fix is Ending*, KITCO NEWS (July 18, 2014), http://www.kitco.com/news/video/show/on-the-spot/733/2014-07-18/Good-News-Silver-Fix-Is-Ending--Andrew-Caminschi.

by a distinct tradable advantage to Defendants and other insiders of 25 basis points per fixing "in bull markets, bear markets, and everything in between" during the Class Period.[14]

10.     The undersigned counsel has retained Andrew Caminschi as an expert consultant for this case.  His analysis, further alleged below, has uncovered anomalous pricing behavior around the time of the Silver Fix that is consistent with a systematic suppression of silver prices. This anomalous pricing behavior is highly indicative of pricing information being "leaked" to the silver market prior to the end of the Silver Fix.[15]

11.     Mr. Caminschi has additionally demonstrated that this information leakage, which manifests itself in the form of anomalous spikes in both exchange traded silver futures trading volume and spot physical market price volatility prior to the end of the daily conference call, creates a significant advantage to "informed trades," those with knowledge of the Fix, like the Defendants, compared to other uninformed market participants.  Furthermore, the spikes in volume and volatility observed in the market while the Silver Fix is still ongoing, are highly suggestive of trading by the Fixing Members, as they place trades in the market prior to the Fix being released to the public to capitalize on their informational advantage.

12.     The undersigned counsel also retained Professor Rosa Abrantes-Metz, another expert economist in the field for this case.  Professor Abrantes-Metz, as further alleged below, confirms that, throughout the Class Period, pricing dynamics around the Silver Fix are indicative of a systematic suppression of silver prices, with large price declines during the Silver Fix

---

[14] A video interview of Professor Caminschi may be found at http://www.kitco.com/news/video/show/on-the-spot/733/2014-07-18/Good-News-Silver-Fix-Is-Ending--Andrew-Caminschi.

[15] *See* Andrew Caminschi, *Any Silver Linings? London Silver Fixing Impact on Public Markets Before and After the Introduction of Contemporaneous Futures Trading* (hereinafter *Silver Linings*), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2461098

occurring at an abnormally high frequency.[16]   The size of these price decreases is also highly suspect, as they normally dwarf any price increases observed during the Silver Fix.

13.     Professor Abrantes-Metz has also demonstrated that the impact of this systematic price suppression extends beyond the few minutes surrounding the Silver Fix, where large price drops are frequently observed, and extends to other days that do not exhibit such obvious price declines.   This price impact is connected directly to the Defendants activity in the spot silver market, as represented by their bid and ask price quotes, which initiate the downward price trend observed around the start of the Silver Fix.

14.     This Complaint thus follows government investigations, an extensive review of the evolving public record, ongoing proprietary and other analysis by leading economists in the field—including two prominent experts retained by counsel for Plaintiff—and, significantly, the abrupt end of the Silver Fix—after 117 years in existence—on August 14, 2014.

15.     The Complaint also follows the replacement of the "Silver Fix" with the "London Silver Price."   Upon the Silver Fixing announcing on May 14, 2014, that it would cease operations in three months, the venerable London Bullion Market Association ("LBMA") and others quickly embarked on a search for a replacement for the Silver Fix.   After bids by the likes of the London Metal Exchange, Intercontinental Commodity Exchange, and Platts, to run the new benchmarking process, the LBMA settled upon the CME Group and Thompson Reuters to run the new fix, which would replace the old fix, under a different name: the "London Silver Price."

16.     While losing the "unfortunate name," in favor of a bland one, and the "private teleconference," in favor of electronic trading, THE FINANCIAL TIMES reports that "anyone

---

[16] *See* Rosa M. Abrantes-Metz & Albert D. Metz, *Was The London Silver Fixing Fixed For Years*? (November 2014) (unpublished manuscript on file with counsel)

thinking there has been a complete change in the way the daily snapshot of the silver market is conducted would be mistaken.  The new benchmark . . . keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price."[17]  Two of the other main features that continue are HSBC and Scotiabank, each of which is (or remains) on the London Silver Price panel.

17.     The Silver Fix has finally ended.  But the damage has been done.  And it remains to be seen whether the new regime will be more than a name change.  Plaintiffs, on behalf of themselves and a class of those similarly damaged, seeks relief from This Honorable Court for Defendants' antitrust violations, commodity manipulation, and unjust enrichment from at least January 1, 1999, through the date on which the effects of Defendants' unlawful conduct cease.

18.     Given the ongoing government investigations into the Silver Fix and the significant amount of economic evidence presented in this complaint, Plaintiffs believe that further evidentiary support for their claims, as alleged herein, will be revealed after a reasonable opportunity for discovery.

## II.     PARTIES

### A.     Plaintiffs

19.     Plaintiff Christopher DePaoli ("DePaoli") is a natural person, who resides in the State of Florida.  Plaintiff DePaoli engaged in U.S.-based transactions in COMEX silver futures contracts, COMEX "miNY" silver futures contracts and options, and NYSE LIFFE mini silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade and as a consequence thereof was damaged and suffered legal injury.

---

[17] *New silver price is 'improvement' on fix*, THE FINANCIAL TIMES (July 16, 2014), http://www.ft.com/intl/cms/s/0/4053ff04-0ccb-11e4-90fa-00144feabdc0.html#axzz38yxp1nAQ.

20.     Plaintiff Kevin Maher ("Maher") is a natural person, who resides in the State of New York.   Plaintiff Maher engaged in U.S.-based transactions in COMEX silver futures contracts and options during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade and as a consequence thereof was damaged and suffered legal injury.

**B.     Defendants**

**1.     The London Silver Market Fixing, Ltd.**

21.     Defendant THE LONDON SILVER MARKET FIXING, LTD. is a British private company with its principal place of business located at One Silk Street, London EC2Y 8HQ, United Kingdom.   The London Silver Market Fixing, Ltd. was the entity that administered the Silver Fix for its three member banks—Defendants Deutsche Bank AG, HSBC Bank (U.S.A.), NA, and The Bank of Nova Scotia.

**2.     Deutsche Bank Defendants**

22.     Defendant DEUTSCHE BANK AG is a German *aktiengesellschaft* with its principal place of business located at Taunusanlage 12, 60325 Frankfurt, Germany.   It owns 100% of the equity and voting interests in Deutsche Bank Americas Holding Corporation; DB U.S. Financial Markets Holding Corporation; Deutsche Bank Securities, Inc.; Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas; and Deutsche Bank AG, New York Branch.

23.     Defendant DEUTSCHE BANK AMERICAS HOLDING CORPORATION is a Delaware corporation with its principal place of business located at 60 Wall Street, New York, NY 10005.  It is a second tier holding company for Deutsche Bank AG subsidiaries in the United States.

24.     Defendant DB U.S. FINANCIAL MARKETS HOLDING CORPORATION is a Delaware corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is a second tier holding company for Deutsche Bank AG subsidiaries in the United States.

25.     Defendant DEUTSCHE BANK SECURITIES INC. is a Delaware corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is registered as a broker dealer and investment advisor with the Securities and Exchange Commission, a municipal advisor with the Municipal Securities Rulemaking Board, and a futures commission merchant with the Commodities Future Trading Commission. It is a member of the New York Stock Exchange.

26.     Defendant DEUTSCHE BANK TRUST CORPORATION is a New York corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is a bank holding company under Federal Reserve Board regulations.

27.     Defendant DEUTSCHE BANK TRUST COMPANY AMERICAS is a New York corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is the U.S. banking subsidiary of Deutsche Bank AG, and it is a New York State-chartered bank and member of the Federal Reserve System. It originates loans and other forms of credit, accepts deposits, arranges financings, and provides numerous other commercial banking and financial services.

28.     Defendant DEUTSCHE BANK AG, NEW YORK BRANCH is a wholesale branch of Deutsche Bank AG licensed by the New York State Department of Financial Services and regulated by the Federal Reserve and Germany's financial watch dog, *Bundesanstalt für Finanzdienstleistungsaufsicht* ("BaFin"), with its principal place of business located at 60 Wall

Street, New York, NY 10005.  Deutsche Bank AG engages in U.S. banking activities directly through its New York branch.  The New York branch is licensed by the New York Superintendent of Financial Services to conduct a commercial banking business and is required to maintain eligible high-quality assets with banks in the State of New York (up to a maximum of U.S.$100 million of assets pledged so long as the New York branch remains "well rated" by the New York State Superintendent of Financial Services).

29.    Deutsche Bank AG was a member of the London Silver Market Fixing, Ltd. during the entire Class Period until August 14, 2014, when it withdrew from the LBMA Silver fixing panel.

30.    Defendants Deutsche Bank AG; Deutsche Bank Americas Holding Corporation; DB U.S. Financial Markets Holding Corporation; Deutsche Bank Securities, Inc.; Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas; and Deutsche Bank AG, New York Branch, are collectively referred to herein as "Deutsche Bank."

31.    Deutsche Bank is a member of the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

### 3.    HSBC Defendants

32.    Defendant HSBC HOLDINGS PLC is a British public limited company with its principal place of business located at 8 Canada Square, London E14 5HQ, United Kingdom.  It owns 100% the equity and voting interests in Defendants HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc.

33.    Defendant HSBC NORTH AMERICA HOLDINGS INC. is a Delaware corporation with its principal place of business located at 452 Fifth Avenue, New York, NY 10018.

10

34.    Defendant HSBC BANK U.S.A., N.A. is a national bank chartered under the National Bank Act and regulated by the Office of the Comptroller of the Currency with its principal place of business located at 1800 Tysons Blvd., Suite 50, McLean, Virginia 22101.

35.    Defendant HSBC USA INC. is a Delaware corporation with its principal place of business located at 452 Fifth Avenue, New York, NY 10018.

36.    Defendants HSBC Holdings plc, HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc. are collectively referred to herein as "HSBC."

37.    HSBC Bank (U.S.A.), N.A was a member of the London Silver Market Fixing Ltd. during the entire Class Period until August 14, 2014.

38.    HSBC Bank (U.S.A.), N.A. is a member of the LBMA London Silver Fixing Panel.

39.    HSBC is a member of the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

### 4.    Scotiabank Defendants

40.    Defendant THE BANK OF NOVA SCOTIA (a/k/a Scotiabank) (a/k/a ScotiaMocatta) is a chartered Schedule I Bank under the Canada Bank Act, located at 1709 Hollis Street, Halifax, Nova Scotia, Canada, with executive offices located at Scotia Plaza, 44 King Street West, Toronto, Canada.  It is listed on the Toronto Stock Exchange and the New York Stock Exchange.  It owns 100% the equity and voting interests in Defendants Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York.

41.    Defendant SCOTIABANC INC. is a Delaware corporation with its principal place of business located at 711 Louisiana Street, Suite 1400, Houston, Texas 77002.

42.     Defendant SCOTIA HOLDINGS (US) INC. is a Delaware corporation with its principal place of business located at 600 Peachtree Street NE, Atlanta, GA 30308-2219.

43.     Defendant SCOTIA CAPITAL (USA) INC. is a New York corporation and registered broker and dealer in securities with the U.S. Securities and Exchange Commission, and member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located at 1 Liberty Plaza, New York, NY 10006.

44.     Defendant THE BANK OF NOVA SCOTIA TRUST COMPANY OF NEW YORK is trust company regulated by the New York State Department of Financial Services and the Federal Reserve Bank of New York and a subsidiary of Scotia Holdings (US) Inc., with its principal place of business located at One Liberty Plaza, 165 Broadway, 26th Floor, New York, NY 10006.

45.     Defendants The Bank of Nova Scotia, Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to herein as "Scotiabank."

46.     The Bank of Nova Scotia was a member of London Silver Fixing Ltd. during the entire Class Period until August 14, 2014.

47.     Scotiabank is a member of the LBMA London Silver Fixing Panel.

48.     Scotiabank is a member of the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

### 5.     UBS Defendants

49.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland that provides investment banking, asset management and wealth management services for private, corporate, and institutional clients

12

worldwide.  It has operations in over 50 countries, including in the United States.  UBS' United States headquarters are located in New York, New York and Stamford, Connecticut.

50.     Throughout the class period UBS was the third most active participant in the spot market for physical silver. On November 12, 2014, the Swiss Financial Market Supervisory Authority ("FINMA") ordered UBS to pay 134 million Swiss francs (approximately $139 million) to settle the foreign exchange and precious metals probe that began in 2008.  Following the settlement, FINMA reported, "[t]his conduct was partly coordinated with other banks" and "electronic communications platforms played a key role."  According to BLOOMBERG NEWS, FINMA said it found 'serious misconduct" by UBS and a "clear attempt to manipulate fixes in the precious metal market," including Silver Fixing, during its investigation into precious metals and foreign exchange trading at UBS.  FINMA reported that UBS was front running precious metals trades, which is when traders profit from advance knowledge about a transaction expected to influence prices, over client orders for silver.  FINMA Director Mark Branson said in a conference call, "The behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange."

51.     UBS is accredited to participate in the new LBMA London Silver Price and is a member of the unlawful combination and conspiracy alleged here in.

### 6.     Jane Doe Defendants

52.     Jane Doe Defendants Nos. 1-100 are other entities or persons, including banks, interdealer brokers, cash brokers and other co-conspirators whose identities are currently unknown to Plaintiff.  The Jane Doe Defendants participated in, furthered, and/or combined, conspired, aided and abetted, or agreed with others to perform the unlawful acts alleged herein.

### 7. Agents and Co-conspirators

53. Other entities and individuals unknown to Plaintiff at this time participated as co-conspirators and performed acts in furtherance of the conspiracy. Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control or transaction of business or affairs of the corporation or partnership.

## III. JURISDICTION, VENUE, AND COMMERCE

54. This action arises under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively.

55. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

56. The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under the laws of the several states.

57. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

58. Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

59.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to effectuate their illegal scheme.

60.     Defendants' manipulation, conspiracy and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

61.     Silver and silver derivatives contracts, like COMEX silver futures contracts, are commodities that trade in interstate commerce.  Defendants' restraint of trade and intentional manipulation of silver and silver derivatives prices had direct, substantial and foreseeable effects in the United States and on Plaintiffs and members of the Class.  Billions of dollars of silver and silver derivatives were traded in the United States during the Class Period.  Defendants, as Silver Fixing Members and sophisticated market participants, knew the results of the Silver Fixing are (and were during the Class Period) disseminated in the United States, and are (and were during the Class Period) used to price silver and silver derivatives, including COMEX silver futures contracts.  For these reasons, Defendants knew that manipulating the Silver Fixing, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of silver derivatives such as COMEX silver futures contracts.

62.     Defendants' conduct had a substantial effect on the intrastate commerce of each of the fifty United States and its territories.

63.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy, in the United

States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

64.     The Court has quasi in-rem jurisdiction over at least certain of the Defendants by virtue of their substantial physical assets located in New York, including caches of COMEX-registered silver bullion held in vaults in New York by at least HSBC and Scotiabank.

## IV.   DEFENDANTS SET THE GLOBAL BENCHMARK PRICE OF SILVER THROUGH THE LONDON SILVER FIX DURING THE CLASS PERIOD

65.     Prior to and during the Class Period, silver prices were set each business day by the concerted action of Defendants, through an "old-fashioned and opaque,"[18] process called the Silver Fix.  "The price fixings [we]re then used to determine prices worldwide."[19]

66.     The Silver Fix "was born in the late 19th century when a handful of London bullion dealers agreed to meet daily under a cloud of cigar smoke to set the price for the 'devil's metal.'"[20]  The original members of the Silver Fixing in 1897 were: (i) Mocatta & Goldsmid; (ii) Sharps & Wilkins; (iii) Pixley & Abell; and (iv) Samuel Montagu & Co.

67.     Until August 14, 2014, this "venerable City of London institution"[21] was orchestrated by Defendant London Silver Market Fixing, Ltd.  Each business day the three Silver

---

[18] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

[19] *US regulator considering an inquiry into London's gold and silver markets to check if prices are open to manipulation*, THE GUARDIAN (Mar. 13, 2013), http://www.theguardian.com/business/2013/mar/13/london-financial-sector-gold-market/print.

[20] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

[21] *What's The London Silver Fix, And Why's It Going Away?* THE WALL STREET JOURNAL (May 14, 2014), http://blogs.wsj.com/moneybeat/2014/05/14/whats-the-london-silver-fix-and-whys-it-going-away/.

Fixing Members—Defendants Deutsche Bank, HSBC, and Bank of Nova Scotia met on a secure conference call at 12:00 pm London Time to fix the price of physical silver.  The Silver Fix, which typically took 10 to 15 minutes, was conducted as a "Walrasian" or simultaneous auction led by one of the Silver Fix Members who was designated as the "Chairman."  The Chairman position rotated among the Silver Fix panel members each year.

68.     The Silver Fix ostensibly started with the Chairman's determination of what was considered to be the U.S. Dollar "spot price" or current market price of silver in the London market.  This was the opening price for the auction.  The Silver Fix panel members would then begin trading at the opening price.  Each Silver Fix panel member examined its order book, which contained orders from clients' brokerage accounts along with proprietary orders from that Silver Fix panel member's own trading desk.  Based on those orders, each of the Silver Fix panel members would then declare how many bars of silver (around 1,000 troy ounces each) they would be willing to buy or sell at the opening price in 50 bar increments.

69.     After each participant placed their orders, the transactions were netted against each other.  If the amount of buying interest was equal to the amount of selling interest the Silver Fix was complete.  Otherwise, the Chairman would adjust the price up or down and the process would be repeated until the total amount of silver bought was within 300 bars of the total amount sold.  For example, if at the opening price the Silver Fixing Members expressed interest in buying a total of 1000 bars of silver but only 300 bars were offered for sale, the Chairman would have progressively raises the price, inducing the sellers to offer more silver, until the difference between the buyers and sellers was 300 bars or less.

70.     If for some reason this 300 bar threshold could not be reached, the Chairman could unilaterally fix the price of silver and the Silver Fixing Members would divide the excess

supply or demand pro-rata among themselves.  For example, if there were one buyer and two sellers and the one buyer was willing to purchase 300 bars more than what was being offered, the buyer would have reduced its buying interest by 100 bars and each of the sellers would increase their selling interest by 100 bars, collectively absorbing the 300 bar difference.

71.    Once this "price-setting ritual"[22] was completed, the final price was published to the market.  THE WALL STREET JOURNAL published a schematic of the Silver Fix earlier this year.[23]



---

[22] *Century old London silver fixing firm closes shop*, RESOURCE INVESTOR (May 14, 2014), http://www.resourceinvestor.com/2014/05/14/century-old-london-silver-fixing-firm-closes-shop?ref=hp.

[23] *Curtain to Fall on London's Historic Silver Benchmark*, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

72.     The importance of the Silver Fix cannot be overstated.   Investors and silver market participants throughout the world used the result of the Silver Fix to price billions of dollars in physical silver and silver derivatives, including COMEX silver futures contracts, each trading day.  With the value of so many transactions linked to the Silver Fix, even small changes in the Silver Fix resulted in millions of dollars in gains or losses for silver market participants, including COMEX silver futures traders.

73.     Despite the importance of the Silver Fix and its impact on the silver market as a whole, the entire process took place in secrecy.   The daily conference calls were completely private.  To Plaintiffs' knowledge, no records of what was said on the daily conference calls have been published and there was no active regulatory oversight of the Silver Fix.   No one was allowed to observe the auction process or to verify the price information submitted during the auction.  This extreme level of secrecy created an environment ripe for manipulation.

74.     Defendants had a strong financial incentive to use the secretive Silver Fix process to their advantage.   Just as there was no regulatory oversight of the Silver Fix, there were no restrictions on the Bank Defendants' contemporaneous silver trading activity.   Even though Defendants were responsible for fixing the market price of physical silver for the entire world, they were allowed to trade both physical silver and silver derivatives freely—before, during, and after the Silver Fix.  With complete control over the price of silver, the Bank Defendants had a strong financial incentive to establish positions in both physical silver and silver derivatives prior to Defendants' public release of Silver Fix results that allowed them to reap large illegitimate profits, which, Plaintiffs allege, they in fact did.

## V.   THE SILVER FIX SET THE PRICE OF PHYSICAL SILVER AND FINANCIAL INSTRUMENTS TIED TO THE PRICE OF PHYSICAL SILVER DURING THE CLASS PERIOD

75.     The Silver Fix set the prices for both physical silver and financial instruments tied to the price of physical silver, including derivatives contracts, such as silver futures and options. In the words of THE ECONOMIST, "Commodity prices are not just for buyers and sellers of the physical stuff.  They are also the basis of derivative markets—futures contracts, options, and combinations of these and other financial instruments—which can be far larger.  A twitch in the 'benchmark' price can mean big shifts in the value of derivatives, and profits for the prescient."[24]

76.     Thus, the "London silver fix is a global benchmark that is used by everyone from jewelers to miners to price their deals."[25]  THE WALL STREET JOURNAL reports, for example, that the Silver Fix "plays a crucial role in the roughly $30 billion a year global trade in silver.  It affects the price of jewelry, helps determine the value of some derivative contracts and impacts the earnings of mining companies that sell raw material to metals refiners."[26]  "Central banks also use the fix as a benchmark price for buying and selling silver for their reserves.  The fix is also used to price assets tied to silver, such as exchange-traded funds."[27]

---

[24] *In a Fix, Mr. Bond: New Concerns Surround the Way the World Gold Price Is Set*, THE ECONOMIST (Mar. 8, 2014), http://www.economist.com/news/finance-and-economics/21598676-new-concerns-surround-way-world-gold-price-set-fix-mr-bond.

[25] *Curtain to fall on London's historic silver benchmark*, MARKETWATCH (May 14, 2014), http://www.marketwatch.com/story/curtain-to-fall-on-londons-historic-silver-benchmark-2014-05-14.

[26] *Curtain to Fall on London's Historic Silver Benchmark*, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

[27] *Curtain to Fall on London's Historic Silver Benchmark*, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

77.    The prices of certain financial instruments, such as silver derivatives, including silver futures and options, are directly and proximately caused by, and inextricably intertwined with, prices for physical silver fixed by Defendants' combination.

**A.    Physical Silver**

78.    Physical silver is traded over the counter ("OTC") by reference to the price fixed and manipulated by Defendants.  The fixed price is ostensibly a mechanism of price discovery designed to allow traders to transact at a competitive market price.  Defendants, the fixers, transact both on their own behalf and for and with customers.  Customers that transact in silver at the fix with Defendants pay them a premium.  Each of the bank Defendants operates both as a price fixer and a market maker, trading with its customers.  Defendants thus not only have the means and opportunity to conspire to fix prices through the Silver Fixing, they also have strong motive to do so.

79.    There are a variety of ways that physical silver is traded.  Examples include trading of silver bars and coins, with actual physical delivery, as well as through bullion accounts.  According to Scotiabank, "For investment diversification, precious metals bullion is an alternative asset to any investment strategy."[28]

80.    Physical silver may be held in either allocated or unallocated accounts.  The key difference is where credit risk is allocated.  An allocated account gives entitlement to specific, designated stock, which is segregated, and for which the account holder is provided a list of bar numbers, weights and assays of each bar.  Silver certificates, such as those sold by Scotiabank,

---

[28] Scotiabank website, at http://www.scotiamocatta.com/products/bullion.htm.

"may look and feel like paper, but they're every bit as valuable as the precious metals they represent," and are fully convertible to silver bullion.[29]

81.    A bullion bank, like Deutsche Bank, HSBC, or Scotiabank, acts as a custodian for the account holder, which has full title to its physical silver.  An unallocated account gives general entitlement to silver but specific stock is not set aside or assigned to the account holder. Balances on the account are backed by the general stock of the bullion clearer with whom the account is held.

**B.    Exchange-Traded Silver Derivatives**

**1.    COMEX Silver Futures Contracts and Options**

82.    In the United States, most silver futures and options contracts are traded on COMEX, short for Commodity Exchange, Inc., which is a division of the New York Mercantile Exchange.  COMEX is a Designated Contract Market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.

83.    Silver futures contracts and silver options contracts traded on an exchange provide standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending into the future depending upon the month of contract execution.  Trading is conducted for delivery during certain designated months.

84.    COMEX, as a contract market designated by the U.S. Commodity Futures Trading Commission ("CFTC"), submits to the CFTC for approval various rules and regulations that are the basis for how COMEX standardizes the contracts that trade on its exchange as well as how it administers the actual trading and settlement of those contracts.

---

[29] Scotiabank website, at http://www.scotiamocatta.com/products/certificates.htm.

85.     A standard COMEX silver futures contract is an agreement to buy or sell a fixed amount of silver, generally 5,000 troy ounces, at a specified date in the future.  The price of each contract is quoted in United States Dollars per troy ounce, for example a contract price of $20 represents an agreement to buy or sell silver at $20 per troy ounce on some future date.

86.     The "notional value," what the contract is actually worth, is much higher than the quoted price.  Because each COMEX silver futures contract is an agreement to buy or sell 5,000 troy ounces of silver, the notional value of a contract with a price of $20 is really $100,000 or the agreed to price per ounce of silver multiplied by 5,000 troy ounces.

87.     COMEX specifies the terms of trading for silver futures contracts, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

88.     COMEX also specifies the months in which silver contracts will be available.  According to COMEX rules, during each calendar month, contracts that provide for delivery of silver in the following months will be available: (1) the current calendar month; (2) the next two calendar months; (3) any January, March, May, and September falling within a 23-month period; and (4) any July and December falling within a 60-month period beginning with the current month.

89.     While COMEX silver futures contracts can exist for every month of the year, not all contracts are traded with the same frequency.  Contracts for certain months are more heavily traded than others.  Generally, the March, May, July, September and December contracts are the most heavily traded.  There is substantially less trading volume in contracts for the remaining months.

23

90.     A COMEX silver futures contract trades until the third to last business day of the contract month.  For example, if the last business day of May 2014 is Friday, May 30, a May 2014 COMEX silver futures contract will trade until Wednesday, May 28, 2014.

91.     Trading occurs both electronically and in person until the last trading day.  As COMEX is a member of the CME, COMEX silver futures contracts are traded on the CME Globex and CME ClearPort electronic trading platforms as well as in open outcry auctions on the floor of the New York Mercantile Exchange.

92.     Because a futures contract represents a bilateral agreement, there are always two sides or positions for the related transaction.  These positions are equivalent to that of buyer and seller.  The person or entity that is buying the futures contract has what is called a "long" position.  The one selling the contract has a "short" position.

93.     Those in the long and short positions have different roles as the futures contract nears expiration, or the last trading day for that specific contract.  Longs (as the buyers of the contract) are obligated to take delivery of the underlying commodity, in this case silver, while shorts (as the sellers) are required to make delivery of the amount of silver represented by their contracts.

94.     This process of exchanging metals between buyer and seller is called "settlement."  All futures contracts are settled following their expiration, however, in most cases this does not result in an exchange of the physical commodity.  Market participants have the option to offset or "financially settle" their futures positions.  In financial settlement, instead of taking or making delivery of the physical commodity, investors in either the long or short position can offset their obligations with contracts for an equal but opposite position.  For example, as a purchaser of a silver futures contract who is long can settle their obligation to take

delivery of physical silver by selling an offsetting short futures contract for the same amount of physical silver.

95.     The difference between the two contract prices, for example the difference between the price at which the initial contract was purchased and the price at which the later offsetting contract was sold, is the profit or loss to the trader.  Traders with long positions, as buyers of the underlying commodity, benefit as the price of the commodity rises since they are able to sell an offsetting short contract at a higher price.  Those with short positions, as sellers of the underlying commodity, benefit as the price of the commodity decreases as they are able to buy an offsetting long contract at a lower price.

96.     In addition, there are two types of options: calls and puts.  A call gives the holder of the silver option the right, but not the obligation, to buy the underlying silver futures contract at a certain price, the strike price, up until some point in the future—options expiry.  Conversely, the put gives the holder the right, but not the obligation, to sell the underlying silver futures contract at the strike price until options' expiry.  Puts are usually bought when the expectation is for falling prices; a call is usually purchased when the expectation is for rising prices.  The price at which an option is bought or sold is the premium.  There are various ways to use options to go short, *i.e.*, profit from silver price decreases, or go long, *i.e.*, profit from silver price increases.  As to going short, one can sell a futures contract, buy put options, or sell call options.

### 2.     COMEX miNY Silver Futures Contracts

97.     COMEX also offers a silver futures contract, called the COMEX "miNY" silver futures contract, which is priced based on 2,500 troy ounces of silver, half the size of a traditional COMEX silver futures contract.  These futures contracts are financially settled and do not call for physical delivery of silver, on the third to last business day of the month prior to the named contract month.

### 3. NYSE LIFFE Mini Silver Futures Contracts and Options

98.     In addition to silver derivatives traded on COMEX, investors also trade silver futures and options on other exchanges.  For example, "Mini" Silver futures and options, which are priced based on 1,000 troy ounces of silver, were traded on the NYSE LIFFE exchange within U.S. during the Class Period.  These futures contracts and options are now traded within the United States on the Intercontinental Exchange ("ICE").  NYSE LIFFE and ICE mini silver futures contracts and options function in exactly the same way as COMEX silver futures contracts and options.[30]

### C. Other Financial Instruments

### 1. Over the Counter Commodity Swaps

Over-the-counter ("OTC") commodity swaps are another example of a vehicle by which investors had exposure to the Silver Fix during the Class Period.  "A commodity swap is a cash-settled agreement in which two parties agree to a series of cash flows based on an agreed (notional) quantity of a commodity.  One party typically pays a fixed price for the notional quantity and the other a floating price.  The major distinction between a forward and a swap is that a forward is an agreement on one exchange, while a swap is an agreement on a series of exchanges."[31]  Silver serves as an underlying commodity in such agreements.  Indeed, the International Swaps and Derivatives Association ("ISDA"), the standard setting body for the OTC derivatives industry specifically defined SILVER-FIX as the price set by the Silver Fix.

---

[30] ICE website, at https://www.theice.com/products/Futures-Options/Foreign-Exchange#/products/31500923/Mini-Silver-Future; ICE website, at https://www.theice.com/products/Futures-Options/Foreign-Exchange#/products/31500927/Options-on-1000oz-Mini-Silver-Future.

[31] *Product Descriptions and Frequently Asked Questions*, ISDA, http://www.isda.org/educat/faqs.html#34.

Upon the announcement that the Silver Fix was ending, ISDA announced that its silver benchmark also would be changing for the fix.[32]   Silver commodity swaps are now tied to the LBMA London Silver Price.[33]

### 2.   Exchange Traded Funds

99.    Investors also may invest in Exchange Traded Funds ("ETFs") tied to the price of silver, including ETFs expressly using the Silver Fix as their sole benchmark.   One example is the "ProShares Ultra Silver," which is traded on NYSE Arca (ACQ), and seeks daily investment results corresponding to "two times (2x) the daily performance of silver bullion as measured by the U.S. Dollar price for delivery in London."[34]   Currently, the benchmark is the LBMA London Silver Price, and, prior to August 14, 2014, the underlying benchmark of this ETF was the daily London Silver Fix.[35]

100.    Another example of a silver ETF is the iShares Silver Trust, which is traded on NYSE Arca (SLV).   Prior to August 15, 2014, it was benchmarked to the London Silver Fix, like the ProShares ETFs.   Now, it is benchmarked to the new LBMA Silver Price.[36]

---

[32] *Explanatory Statement – winding down of London Silver Fix*, ISDA, http://assets.isda.org/media/8551c34a/34ac6e65.pdf/.

[33] *ISDA publishes Bilateral Form of Amendment Agreement for Certain Silver Transactions*, ISDA, http://www2.isda.org/news/isda-publishes-bilateral-form-of-amendment-agreement-for-certain-silver-transactions.

[34] Fact Sheet, *ProShares UltraSilver*, http://www.proshares.com/media/fact_sheet/ProSharesFactSheetAGQ.pdf.

[35] Fact Sheet, *ProShares UltraSilver*, http://www.proshares.com/media/fact_sheet/ProSharesFactSheetAGQ.pdf.

[36] Fact Sheet, *iShares Silver Trust*, http://www.ishares.com/us/literature/fact-sheet/slv-ishares-silver-trust-fund-fact-sheet-en-us.pdf.

**D.      The Silver Fix Directly Affected the Price of Physical Silver, Silver Futures, and Other Silver-Based Derivatives Tied to the Price of Physical Silver during the Class Period**

101.     As a general matter, prices on the physical spot markets are intimately related to corresponding prices on the futures markets.  The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, related.

102.     The prices of COMEX silver futures and other financial instruments tied to the price of physical silver are directly and proximately caused by, and directly linked to the price of physical silver, which was fixed by Defendants' combination.  Any artificial prices in physical silver thus were inextricably intertwined with any artificial prices in financial instruments tied to the price of physical silver set by the Silver Fix, including COMEX silver futures.

103.     Figure 1 (below) displays the daily closing price of COMEX silver futures contracts and the results of the Silver Fixing from January 2004 through December 2013.  As displayed in Figure 1, over this 10 year period, the price of COMEX silver futures contracts, represented by the dotted line, tracks the results of the Silver Fixing.



**FIGURE 1**

104.    The relationship between COMEX silver futures contracts and the Silver Fixing observed in Figure 1 was confirmed using a regression analysis.  A regression analysis is a statistical tool that is used to evaluate the relationship between two variables.  Comparing the daily closing price of the active COMEX silver futures, *i.e.*, the contract closest to expiration, to the results of that day's Silver Fixing, showed a statistically significant relationship between the price of COMEX silver futures contracts and the results of the Silver Fixing.  The regression analysis produced an $R^2$ value of .9985, indicating that 99.85% of the variation in the price of COMEX silver futures contracts over the 10 year period displayed in Figure 1 was explained by the results of the Silver Fixing.

105.    Plaintiffs' counsel as the result of a Freedom of Information Act ("FOIA") request made to the CFTC, demonstrate that commercial silver traders use the prices of COMEX silver futures contracts to calculate the spot market price of silver, which is listed on the Bloomberg Professional Service under the ticker symbol "XAG:"

**January 30, 2009**:

Trader 1: need to know which comex futures we will use today to calculate spots for XAU XAG XPT XPD

Trader 2: well gold comex went out today at 928.4

Trader 2: silver went out at 12.565

106.    Defendants as commercial silver traders and members of the Silver Fix panel, understood the relationship between the price of COMEX silver futures contracts and the Silver Fix and knew that a manipulation of the Silver Fix would impact both the spot market price of silver and the prices of silver derivatives.

## VI.    DEFENDANTS EXPLOITED AND ABUSED THEIR ADVANTAGEOUS POSITION AS SILVER FIX PANEL MEMBERS BY ENGAGING IN MANIPULATIVE AND COLLUSIVE CONDUCT TO CAUSE ARTIFICIAL SILVER PRICES DURING THE CLASS PERIOD

107.    The private nature of the Silver Fix creates an environment that is highly susceptible to manipulation and collusion.  First, the Silver Fix is a direct exchange of intended or future pricing information among horizontal competitors.  Defendants, as some of the world's largest banks, compete across a wide range of financial service markets, including the market for silver and silver derivatives.  Defendants compete against each other both for customers and in their proprietary trading of silver.  Defendants' private communications during the Silver Fix provided the opportunity to signal their pricing desires to their competitors.

108.    Second, this exchange of pricing information occurs among a very small group of competitors, *i.e.*, Defendants Deutsche Bank, HSBC, and Bank of Nova Scotia, each of which

has a large market share in the market for silver and silver-based derivatives.  In contrast to other benchmarks, which are based on actual market data, the Silver Fixing entrusts the global price of silver to a small group of competitors, making it easy for them to influence prices.  In this situation, collusion becomes a rational strategy for increasing profits at the expense of uninformed market participants that do not have knowledge of the pricing information exchanged during the Silver Fixing or an opportunity to participate in fixing price of silver.

109.    Third, the Silver Fixing Members meet alone on a secure conference call.  The call itself is completely secret.  There are no outside observers, and no recordings of the Silver Fixing have ever been released.  There is no regulatory body that oversees the auction process or verifies the data submitted by Defendants during the Silver Fixing.  In truth, no one except for the Silver Fixing Members knows exactly what occurs on the conference call.  As a result, the Defendants have access to non-public, real time information about changes in the price of silver that is unavailable to the rest of the silver market.

110.    Lastly, the Defendants have a direct financial interest in the outcome of the Silver Fixing.  Defendants are all traders of silver and silver derivatives, including COMEX silver futures contracts.  This creates a financial incentive to manipulate the Silver Fixing in a particular direction in order to financially benefit their proprietary trading positions.

**A.    Defendants Abused their Positions As Silver Fix Panel Members By Manipulating the Silver Fix to Levels That Did Not Reflect the Legitimate Supply and Demand for Silver**

111.    The Defendants, as Silver Fix panel members responsible for establishing the spot price of silver worldwide, had a duty to conduct the Silver Fix in such a way that the resulting price of silver reflected legitimate supply and demand fundamentals.  Instead, during the Class Period, Defendants breached their duties and responsibilities as Silver Fix panel members by, *inter alia*, agreeing to submit false pricing information not reflective of legitimate supply and

31

demand fundamentals during the Silver Fix to manipulate the price of silver and silver-based derivatives to artificial levels that benefitted their trading positions.

**B.** **Defendants Used Their Advance Knowledge of the Silver Fixing Results to Establish COMEX Silver Futures Positions During the Silver Fix Before the Results Were Released to the Public**

112. Defendants unlawfully used their advance, inside knowledge of the Silver Fix to establish positions in the silver market, including positions in silver futures and options, which would increase in value once the results of the Silver Fix were released to the public.

113.    In a scheme akin to front running, Defendants, with complete and unaudited control over the results of the Silver Fix, colluded with each other about where to fix the price of silver, and then either directly or through contact with their trading desks, establish positions in the silver market that would financially benefit from where they knew the price of silver was going to be fixed following the public release of the Silver Fix to the general market.   For



**FIGURE 2**

example, if Defendants decided that the Silver Fix price was going to be higher than currently reflected in the price of COMEX silver futures contracts, Defendants would establish long COMEX silver futures positions that would increase in value once the Silver Fixing results were released to the public and the price of silver increased.

114.    Defendants are also among the most active "market makers," or dealers that both buy and sell silver on a regular and continuous basis at a publicly quoted price, in the spot market for physical silver.   Figure 2 displays the activity of the top 65 market markers in the

silver spot market, based on more than 17 million public spot market quotes, between January 1, 2000, and December 31, 2013. The left vertical axis indicates the name of each market participant, while the white areas demonstrate times when that institution was actively engaged in quoting silver prices in the spot market. Figure 2 shows that the Defendants, HSBC, "BNS" for Bank of Nova Scotia, and "DB" for Deutsche Bank, and UBS, are among the top 20 silver spot market participants.

115. In the same way that Defendants could take advantage of their advance knowledge of the Silver Fix results by establishing positions in the COMEX silver futures market that would increase in value once the Silver Fix was released to the public, they could also use this information to their advantage in the silver spot market. As market makers, the Defendants buy and sell silver hoping to make a profit on the difference between the two prices, known as the "bid-ask spread." Knowing the direction of the Silver Fix in advance benefits Defendants by allowing them to adjust their price quotations, for example, buying silver at lower price and selling at a higher price, generating larger profits from their spot market transactions.

116. Advance knowledge of the Silver Fix also allows the Defendants to adjust their spot market quotes to influence the market price of silver, moving it in a specific direction. In one example of this kind of manipulative conduct, identified by Plaintiffs' experts, Defendant Deutsche systematically quoted silver prices significantly below the quotes of other market participants leading up to and during the Silver Fix, influencing the overall price trend in the spot silver market. *See* Part 10.B, *infra*.

117. As Silver Fix panel members responsible for establishing the price of silver, Defendants had a duty to conduct the Silver Fix in such a way that the resulting price of silver reflected legitimate supply and demand fundamentals. Instead, during the Class Period,

Defendants breached their duties and responsibilities as Silver Fix panel members by, *inter alia*, agreeing to submit false pricing information not reflective of legitimate supply and demand fundamentals during the Silver Fix to manipulate the price of silver and silver derivatives to artificial levels for their financial benefit.

118.    This manipulative conduct rendered Defendants' COMEX silver futures positions, including those initiated and liquidated in or around the Silver Fix, an illegitimate part of the supply-demand equation for the prices of all COMEX silver futures contracts.[37]

**VII.   GOVERNMENT ENFORCERS HAVE BEEN INVESTIGATING THE SILVER FIX**

**A.    Government Enforcers are Aware that the Silver Market is Open to Manipulation**

119.    U.S. and European authorities are investigating the Fix.  In particular, the CFTC said last March that it had "started internal discussions on whether the daily setting of gold and silver benchmarks is open to manipulation."[38]  Early last year, CFTC Commissioner Bart Chilton issued a statement to the International Roundtable on Financial Benchmarks, providing in part:

> I'm pleased we are discussing the critically important topic of benchmarks. We've witnessed blatant and brazen monkeying with the marks.  . . . . the idea that pervasive manipulation, or attempted manipulation, is so widespread should make us all query the veracity of the other key marks.  What about energy, swaps, the gold and **silver fixes in London** and the whole litany of "bors?"  Why would they be any different in the minds of those that may have sought to push or pull

---

[37]  *See Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*, CFTC Dkt. No. 75-14, 1982 WL 30249, at *39 (CFTC Dec. 17, 1982) (explaining that if a price is affected by a factor that is not legitimate, for example, trading that violates contract market rules or laws, then "the resulting price is necessarily artificial").

[38]  *How London's gold and silver price benchmarks are 'fixed,'* REUTERS (Jan 17, 2014), http://uk.reuters.com/assets/print?aid=UKBREA0G19J20140117.

rates?  For me, this means every single mark needs to be reviewed, and potentially investigated.[39]

120.   Commissioner Chilton followed up on these remarks: "Given what we have seen in Libor, we'd be foolish to assume that other benchmarks aren't venues that deserve review."[40] The UK's Financial Conduct Authority has also been looking at precious metals as part of a broader review of financial benchmarks." [41]

121.   Dr. Elke König, the President of BaFin, the German Federal Financial Supervisory Authority, which is one European agency investigating, gave a speech on January 16, 2014, in which she remarked: "Markets depend on the trust of the wider public that they are performing and that they work honestly."[42]  The head of BaFin warned that "manipulation of the metals as well as the foreign exchange market was 'particularly serious.'" [43]

---

[39] *Statement of Commissioner Bart Chilton before the International Roundtable on Financial Benchmarks*, Washington, D.C. (February 26, 2013), http://www.cftc.gov/PressRoom/SpeechesTestimony/chiltonstatement022613 (emphasis added).

[40] *CFTC's Chilton Says 'Foolish' Not to Review Benchmark Pricing*, BLOOMBERG (Mar. 14, 2013), http://www.bloomberg.com/news/2013-03-14/cftc-s-chilton-says-foolish-not-to-review-benchmark-pricing.html.

[41] *Gold price probe extended to Deutsche Bank*, THE FINANCIAL TIMES (Dec. 12, 2013), http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-886f-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[42] *How London's gold and silver price benchmarks are 'fixed,'* REUTERS (Jan 17, 2014), http://uk.reuters.com/assets/print?aid=UKBREA0G19J20140117.

[43] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

122.   "The benchmark setting process remains under scrutiny by regulators including London's Financial Conduct Authority. [44]   In particular, BaFin is reported to have raided and demanded documents from Deutsche Bank, "signal[ing] that BaFin now has greater concerns over the precious metals markets."[45]   The investigations led Deutsche, which had been on the panel for twenty years, to withdraw from the Fix in January 2014,[46] for having "faced scrutiny from the German regulator, BaFin, over its participation in the London gold and silver benchmark setting process over suspicions that the process may have been subject to manipulation by the key players." [47]

123.   On November 9, 2014, THE FINANCIAL TIMES reported that UBS would settle allegations of misconduct in its gold and silver trading business, including the manipulation of silver prices, as part of a group deal over forex rigging allegations with multiple regulators. UBS's precious metals and forex businesses are closely integrated as they have joint management and staff who sit on the same floor as the forex traders.   UBS had previously disclosed that it launched an internal probe of its precious metals business and pushed hard to

---

[44] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[45] *Gold price probe extended to Deutsche Bank*, THE FINANCIAL TIMES (Dec. 12, 2013), http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-886f-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[46] *Deutsche resigns gold and silver price-fix seats*, FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html?siteedition=uk#axzz38yxp1nAQ.

[47] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

speed up its internal precious metals probes to get ahead of rivals in securing immunity agreements.

124.    On November 12, 2014, the Swiss Financial Market Supervisory Authority ("FINMA") ordered UBS to pay 134 million Swiss francs (approximately $139 million) to settle the foreign exchange and precious metals probe that began in 2008.  Following the settlement, FINMA reported, "[t]his conduct was partly coordinated with other banks" and "electronic communications platforms played a key role."  As a result of their findings, FINMA also ordered UBS to cap the variable compensation of UBS's precious-metals staff to 200% of base salary for two years.  According to BLOOMBERG NEWS, FINMA said it found 'serious misconduct" by UBS and a "clear attempt to manipulate fixes in the precious metal market," including Silver Fixing, during its investigation into precious metals and foreign exchange trading at UBS.  FINMA reported that UBS was front running precious metals trades, which is when traders profit from advance knowledge about a transaction expected to influence prices, over client orders for silver. FINMA Director Mark Branson said in a conference call, "The behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange."

125.    According to the November 11, 2014 FCA Final Notice against UBS AG, on August 5, 2009, UBS was fined £8 million (approximately $12.7 million) for losses incurred by customers as a result of unauthorized precious metals trading, including silver-based derivatives between January 2006 and December 2007.  *FCA Final Notice to UBS*, Number 186958, 36 ¶4.5 (November 12, 2014).  Upon further investigation, the FCA discovered that UBS employees had taken part in the trading of precious metals using customer money without authorization and allocated losses to customers' accounts.   Among other improprieties, employees made unauthorized internal transfers between the accounts of affected customers, used an internal

"suspense" account and created unauthorized purported loans between affected clients.  The internal UBS investigation estimated that as many as 50 unauthorized transactions a day were taking place at the operation's peak.  FCA Director of Enforcement and Financial Crime, Margaret Cole, said, "These employees were able to take advantage of UBS' inadequate systems and controls, giving them free rein to make unauthorized trades with customer money that they were then able to conceal."  UBS agreed to settle at an early stage of the FSA's investigation, which qualified the firm for a 20 percent discount on the fine, otherwise UBS would have paid £10 million (approximately $16.6 million).  UBS has since paid compensation in excess of $42 million to redress its customers' losses.

### 1.    The CFTC Identified Several Dates With Aberrant Silver Prices During the Class Period

126.    The CFTC first publicly confirmed that they were investigating complaints of misconduct in the silver market in 2008.

127.    The following information was produced to Plaintiffs' counsel as a result of a FOIA request made to the CFTC.  Among the documents produced was an Order for Commercial Items ("Work Order"), which identified the Expert Witness Services obtained in the CFTC's Silver Price investigation.  In the attached Amended Statement of Work ("SOW"), the CFTC identifies 10 dates "of interest" for the Proposed Expert, FTI Consulting, Inc. ("FTI") to target in its investigation of silver prices.  These dates include: August 22, 2008, August 27, 2008, September 17, 2008, September 18, 2008, October 20, 2008, January 23, 2009, January 27, 2009, February 26, 2009, November 15, 2009, March 10, 2009 and March 10, 2010.

128.    The Work Order authorizes FTI to reassess its "prior analysis of these dates in light of conversations by traders captured in an electronic communication and conduct an analysis of the Bank's OTC transactions on these days to determine if there is any activities

leading up to the [dates of interest] that could be viewed as disconnecting the futures prices from

the forward prices."  In the Work Order, FTI is asked the following, "As for the 16 IM dates we

would like FTI to look for the specific concentrated trading pattern you described to us earlier."

The dates identified by the CFTC are consistent with dates identified by Plaintiffs' proprietary

data mining software which targeted dates with anomalous price and volume changes at the start

of the Silver Fix.

129.    Plaintiffs' proprietary data mining software identified anomalous price and



**FIGURE 3**

volume changes at the start of the Silver Fix, which occurred at 6:00 A.M. Central Standard

Time, on February 26, 2008.  Figure 3 shows the average price and total trading volume of the

March 2009 COMEX silver futures contract on February 26, 2009.  This chart demonstrates that in the minute leading up to and immediately after the start of the Silver Fix, the trading volume for the March 2009 COMEX silver futures contracts increases significantly while the price of COMEX silver futures contracts decreases.

130.    The specific pattern of market activity identified in Figure 3 is consistent with Plaintiffs' expert analysis, and indicative of information regarding the results of the Silver Fix being "leaked" to the market while the Silver Fixing is in progress.  This information leakage is a product of trades being placed by informed traders, like the Defendants, with knowing of the Fix before the results are released to the general public.

### 2.    Commercial Silver Traders Are Aware of Manipulation in the Precious Metals Market

131.    Even commercial silver traders perceived that prices in the precious metals market were manipulated as recently as 2009.  The following instant messages were produced to Plaintiffs' counsel as a result of a FOIA request made to the CFTC.  The identities of individual traders were redacted.  In this conversation, among others, traders discuss their trading strategies in the precious metals market and the surprise that "technical analysis," the forecasting of price direction based on past market price and volume data, continues to work in a manipulated market:

> **June 5, 2009**:
>
> Trader 1: this is a video game
>
> Trader : its all risk management and pattern recognition
>
> Trader : prices i think,
>
> Trader : are actually reflective of human patterns
>
> Trader : as much as the market is manipulated

> Trader 1: technical analysis never seizes to amaze me

132.    In the excerpt from a conversation between two commercial silver traders below, the traders discuss how silver is "dangerous to trade" because liquidity in the market decreases substantially whenever the price decreases:

> **November 8, 2004**:
>
> Trader : I think for like silver and platinum and palladium you can
> get into them and then never be able to get out
> Trader : gold usually has volume though
>
> Trader : like silver especially
>
> Trader : b/c it can be really liquid on the way up, and then not at all on the way
>
> Trader : down
>
> Trader : so dangerous to trade
>
> Trader : silver trader here says silver has been making
>                  millionaires out of billionaires since 1971

133.    These electronic communications are consistent with the proposition that the persistent downward manipulation of silver prices during the Class Period directly and proximately caused injury to class members by, *inter alia*, impacting the price at which they initiated and liquidated their positions in the market, as Defendants' understood that it was easier to manipulate the price of silver and silver derivatives when the market was illiquid.

**B.    Increasing Pressure to Expand Transparency Results in a Revamped Silver Fix**

134.    In response to the public outcry, government investigations, economists and academics saying that the Silver Fix lacks sufficient regulation and is susceptible to manipulation, on August 2014, the Silver market became the first of the precious metals markets to ditch a daily "Fixing" procedure where dealers agree to a price over telephone.  On August 14,

2014, the Silver Fix ritual was replaced with an electronic, auction-based mechanism to enhance confidence in the silver benchmark.

135.    While losing the "unfortunate name," in favor of the "London Silver Price," and the "private teleconference," in favor of electronic trading, THE FINANCIAL TIMES reports that "anyone thinking there has been a complete change in the way the daily snapshot of the silver market is conducted would be mistaken.  The new benchmark . . . keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price."[48]  Two of the other main features that continue are HSBC and Scotiabank, each of which is (or remains) on the London Silver Price panel.

## VIII.   THE DEMISE OF THE SILVER FIX

136.    After 117 years, the Silver Fix officially ended on August 14, 2014.  A series of steps stemming largely from the global government investigations led to its demise.

### A.    Under Government Investigation, Deutsche Bank Put its Seat on the Silver Fixing Panel Up for Sale

137.    In January 2014, Deutsche Bank abruptly announced that it was putting its seat on the panel up for sale, having "faced scrutiny from the German regulator, BaFin, over its participation in the London gold and silver benchmark setting process over suspicions that the process may have been subject to manipulation by the key players."[49]

---

[48] *New silver price is 'improvement' on fix*, THE FINANCIAL TIMES (July 16, 2014), http://www.ft.com/intl/cms/s/0/4053ff04-0ccb-11e4-90fa-00144feabdc0.html#axzz38yxp1nAQ.

[49] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

138.    Deutsche "said it would continue to participate in price setting until it finds a buyer, but would resign its seat if it fails to do so."[50]   At the time, however, it seemed resignation would be unlikely as the sale was said to present "an opportunity for a new bank to join the elite club of price setters in one of the world's largest precious metals trading hubs."[51]   And "Deutsche said it had already begun talks with other banks to sell its role."[52]

## B.    Deutsche Was Unable to Sell What Should Have Been a Valuable Seat

139.    Deutsche Bank did try to sell its seat on the panel, but, tellingly, there were no takers.[53]   "A source close to the German bank said it had tried to sell its positions but had been 'unable to agree terms with any prospective buyers.'"[54]

## C.    Deutsche Resigned Unable to Sell its Seat

140.    Having found no buyer, Deutsche announced its resignation.[55]   The Silver Fix thus "was put on the fast track to extinction . . . leaving just two banks still taking part— Bank of

---

[50] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[51] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[52] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[53] *CME and Thomson Reuters to set silver Benchmark*, FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

[54] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl .

Nova Scotia and HSBC Holdings PLC."[56] THE FINANCIAL TIMES reported, "Deutsche's withdrawal from the three-seat silver fixing . . . will probably present a problem,"[57] quoting a precious metals banker as stating, "I don't see how it can function with only two members so they are going to have to work something out."[58]

### D.    The Full Panel Announced it Would Be Disbanding

141.    In the wake of this and "on the heels of increased scrutiny by European and US regulators into precious metals price-setting following the Libor scandal and probe into possible forex market abuse,"[59] Defendants announced that they would disband their combination as of August 14, 2014.[60] "The century-old method of setting silver prices—daily chats among a small coterie of banks—[wa]s being scrapped for something more modern."[61]

---

[55] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl .

[56] *Concerns Remain Ahead of New Silver Benchmark Debut*, THE WALL STREET JOURNAL (Aug. 14, 2014), http://online.wsj.com/articles/concerns-remain-ahead-of-new-silver-benchmark-debut-1408043599#printMode .

[57] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl.

[58] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), at http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl.

[59] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

[60] Press Release, The London Silver Market Fixing Limited, REUTERS (May 14, 2014), http://www.reuters.com/article/2014/05/14/idUSnMKWWsY3ca+1e8+MKW20140514.

[61] *Bullion Fixes in Flux*, THE WALL STREET JOURNAL (June 18, 2014), http://online.wsj.com/articles/bullion-industry-to-meet-in-july-to-discuss-london-gold-fix-overhaul-1403082075.

142.   As reported by THE FINANCIAL TIMES:

The current daily fix, which has been an integral part of London's $1.6tn-a-year silver market for decades, and controlled by a handful of banks, has lost its lustre in recent years due to concerns about transparency and vulnerability to manipulation. It is shutting down because Deutsche Bank failed to find a buyer for its seat, leaving only two other members.[62]

143.   In May 2014, three months prior to actually closing operations, the Silver Fixing panel members issued the following press release:

The London Silver Market Fixing Limited

Incorporated in England and Wales With Registered Number 3685039; Registered Office: One Silk Street, London EC2Y 8HQ

LONDON, UNITED KINGDOM--(Marketwired - May 14, 2014) - The London Silver Market Fixing Limited (the 'Company') announces that it will cease to administer the London Silver Fixing with effect from close of business on 14 August 2014. Until then, Deutsche Bank AG, HSBC Bank USA N.A. and The Bank of Nova Scotia will remain members of the Company and the Company will administer the London Silver Fixing and continue to liaise with the FCA and other stakeholders.

The period to 14 August 2014 will provide an opportunity for market-led adjustment with consultation between clients and market participants.

The London Bullion Market Association has expressed its willingness to assist with discussions among market participants with a view to exploring whether the market wishes to develop an alternative to the London Silver Fixing.

Q&A

1. What will happen after 14 August 2014? Will the Silver Fixing cease to exist?

With effect from the close of business on 14 August 2014, the Company will cease to administer a Silver Fixing, and a daily Silver Fixing Price will no longer be published by the Company.

2. What will happen in the period up to that date?

---

[62] *CME and Thomson Reuters to set silver Benchmark*, THE FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

The Company intends to continue to administer the daily Silver Fixing and publish Silver Fixing Prices throughout that period.

3. Why a three month notice period?

Although members of the Company may resign on seven clear days' notice, the members have confirmed that they stand ready to continue the Company's operations until (and including) 14 August 2014.

4. What happens after 14 August 2014 for market participants with contracts referencing the Silver Fix?

The Company is not in a position to comment on such matters, but market participants can speak to their contractual counterparties.

5. What does this mean for the gold, and platinum and palladium fixing companies?

This decision relates only to the London Silver Fixing administered by the Company.  The Company is not in a position to comment on other fixings.[63]

144.    Once Defendants "decided to pull the plug on the benchmark, they and the

London Bullion Market Association "set about finding a replacement."[64]  According to reports,

the London Silver Fix was in for a "historic makeover."[65]

## IX.    THE LONDON SILVER PRICE HAS REPLACED THE SILVER FIX AS THE GLOBAL BENCHMARK PRICE FOR SILVER

### A.    Fixing the Fix Between the Announcement and the Closing

145.    "The fix is off."[66]  But it has a replacement: the "LBMA Silver Price," also

known as the "London Silver Price."  Leading U.S. silver miner Coeur Mining said that the end

---

[63] Press Release, *The London Silver Market Fixing, Ltd.*, REUTERS ( May 14, 2014), http://www.reuters.com/article/2014/05/14/idUSnMKWWsY3ca+1e8+MKW20140514.

[64] *A Glimpse of the Future as Silver Breaks 117-Year Tradition*, THE WALL STREET JOURNAL (Aug. 15, 2014), http://blogs.wsj.com/moneybeat/2014/08/15/a-glimpse-of-the-future-as-silver-breaks-117-year-tradition/.

[65] Press Release, *The new LBMA Silver Price heralds a new era in precious metals benchmarks*, THOMPSON REUTERS (Aug. 5, 2014), http://blog.financial.thomsonreuters.com/new-silver-fix-heralds-new-era-precious-metals-benchmarks/.

of the Silver Fix and the launch of its replacement was "somewhat surprising, the timing I guess, and the abrupt transition, but it needed to happen."[67]

146.    The LBMA Silver Price ("LSP") is administered by the London Bullion Market Association ("LBMA"), the main standard setting organization for silver and gold bullion, in conjunction with the CME Group, the operator of the COMEX, and Thomson Reuters, the media company that reports other financial benchmarks, such as LIBOR.  CME and Thomson Reuters were chosen by the LBMA after a selection process, which included bids from numerous financial companies to run the replacement for the Silver Fix, and which was the subject of some controversy.

147.    The new process features electronic rather than telephonic trading, but retains similarities to the Silver Fix in that it is an auction among a group of industry panelists.  Notably, two of three charter members of the LSP panel are Defendants HSBC and Scotiabank.  The LSP and COMEX futures have neatly tracked each other since the LSP began in August.

148.    The current members of the LBMA's five LSP panel are: Scotiabank, HSBC JPMorgan, Mitsui, Bank of Toronto and UBS.[68]   The auction is operated by CME and administered by Thomson Reuters, but still takes place daily at 12:00 noon London time.

---

[66] *What's The London Silver Fix, And Why's It Going Away?* THE WALL STREET JOURNAL (May 14, 2014), http://blogs.wsj.com/moneybeat/2014/05/14/whats-the-london-silver-fix-and-whys-it-going-away/.

[67] *Matter of Time for the Gold Fix to Follow Silver*, KITCO (Aug,.13, 2014), http://www.kitco.com/news/video/show/Kitco-News/751/2014-08-13/Matter-Of-Time-For-The-Gold-Fix-To-Follow-Silver----Coeur-Mining.

[68] LBMA Website, http://www.lbma.org.uk/pricing-and-statistics.

According to the LBMA itself, "The earlier benchmarking process has been followed in order to minimize any possible disruptions and enable a seamless transition for the market."[69]

149.    Despite the shift from telephones to computers, critics have complained that the process for selecting the new fixing as well as the fix itself are flawed, prompting some to say, "Meet the New Fix, Same as the Old Fix."[70]

### 1.    The Search for a Replacement Started Almost as Soon as the Announcement That the Silver Fix Was Ending

150.    The LBMA publicly spearheaded the effort to install a replacement for the Silver Fix.  On May 14, 2014, the same day that the London Silver Market Fixing Ltd. announced that the Silver Fix would be no longer exist in ninety days, the LBMA announced that it would lead the charge to find a replacement.  Ruth Crowell, LBMA CEO, stated, "As part of our role as the trade association for the London Bullion Market, the LBMA has launched a consultation in order to ensure the best way forward for a London silver daily price mechanism. The LBMA will work with market participants, regulators and potential administrators to ensure the London Silver Market continues to serve efficiently the needs of market users around the world.  As part of the consultation process, the LBMA will be actively approaching market participants requesting feedback."[71]

151.    Both HSBC and Scotiabank swiftly made public statements committing to creating an "alternative" to the Silver Fix (of which they would eventually take part).  Upon the

---

[69] LBMA Website, http://www.lbma.org.uk/LBMA-silver-price.

[70] *New 'LBMA Silver Price' Farce – Still Shockingly Non-Transparent*, ZERO HEDGE (Aug. 17, 2014), http://www.zerohedge.com/news/2014-08-17/new-%E2%80%98lbma-silver-price%E2%80%99-farce-still-shockingly-untransparent.

[71] Press Release, London Bullion Market Association, THE LONDON SILVER MARKET (May 14, 2014), http://www.lbma.org.uk/_blog/lbma_media_centre/post/the-london-silver-market/.

announcement, a "spokesperson for HSBC said the bank remains 'committed to the silver market and, if the market wishes to develop an alternative to the London Silver Fixing, is willing to take part in discussions with other market participants.'"[72]   Scotiabank's global head of foreign exchange and precious metals said in a statement that the Canadian bank "will work with market participants to find an alternative to the silver fix.'"[73]

### a.   The LBMA

152.    The LBMA describes itself as "an international trade association, representing the London market for gold and silver bullion which has a global client base." [74]   The LBMA sets "refining standards, trading documentation and the development of good trading practices. The maintenance of the Good Delivery List, including the accreditation of new refiners and the regular retesting of listed refiners, is the most important core activity of the LBMA."[75]   The London Good Delivery List "is regarded as the only globally accepted accreditation for the bullion market, ensuring that the wholesale bullion bars traded in the market meet standards and quality required by Good Delivery."[76]

---

[72] Curtain to Fall on London's Historic Silver Benchmark, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

[73] Curtain to Fall on London's Historic Silver Benchmark, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

[74] LBMA Website, http://www.lbma.org.uk/about-us.

[75] LBMA Website, http://www.lbma.org.uk/about-us.

[76] LBMA Website, http://www.lbma.org.uk/the-london-bullion-market.  As it describes itself, the LBMA pre-dates the Silver Fix: "The roots of the London Bullion Market can be traced to the partnership between Moses Mocatta and the East India Company, who started shipping gold together towards the end of the 17th century. Shortly afterwards, while Sir Isaac Newton was master of the Royal Mint, gold in England was overvalued so it became more freely

153.   The leadership of the LBMA continues to include Deutsche, Scotiabank, and HSBC, as well as other multinational banks that have come under investigation for conduct relating to other critical financial benchmarks and markets, including not only the Gold Fixing, but also Aluminum, Credit Default Swaps, Forex, ISDAfix, LIBOR, and Zinc.  The Management Committee of the LBMA includes executives from Scotiabank and HSBC, among others.  The LBMA's Regulatory Affairs Committee includes executives from Deutsche, Scotiabank, and HSBC.  There are thirteen LBMA Market Making Members, including Deutsche, Scotiabank, and HSBC.  The others are Bank of America, Barclays, Citibank, Credit Suisse, Goldman Sachs, JPMorgan, Mitsui, Morgan Stanley, Societe Generale, and UBS.

### 2.   After Search and Soliciting Bids, the LBMA Awarded the Replacement for the Fix to CME and Thomson Reuters

#### a.   Consultation

154.   The LBMA held what it called a consultation, whereby various financial companies vied for the opportunity to run the replacement for the Silver Fix.  The "consultation included silver producers, refiners and manufacturers. The Financial Conduct Authority and Bank of England attended," but only as "observers."[77]   The LBMA sought answers to questionnaires, eventually holding a "Seminar on 20th June which was open to LBMA members, ISDA members and other bullion market participants to assess presentations from possible solution providers for a London daily silver price mechanism."[78]   The top seven proposals were

---

circulated than silver. This increased circulation quickly led to England having a gold based coinage, whereas the rest of Europe remained silver based until the 1850s." *Id.*

[77] *CME and Thomson Reuters to set silver benchmark*, THE FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

[78] LBMA Website, http://www.lbma.org.uk/_blog/lbma_media_centre/post/lbma-2014-silver-price-consultation-seminar/.

presented at the seminar.  Among the finalists who presented in addition to CME and Thompson

Reuters,[79] were Bloomberg,[80] Intercontinental Exchange ("ICE"),[81] The London Metal Exchange

("LME"),[82] and Platts.[83]

155.  On July 11, 2014, after reaching what it called a "clear market consensus," the

LBMA announced that the CME Group and Thomson Reuters "won" the new fix.[84]  Ruth

Crowell, the CEO of the LBMA that assumed office just as Deutsche was announcing its

resignation in early 2014,[85] commented:

> I am delighted that there was a clear market consensus for the CME Group &
> Thomson Reuters joint proposal.  The LBMA liaised throughout the consultation
> process with the FCA. The LBMA is grateful for all the support, comments and
> feedback it has received from all market participants. A  particular thank you to
> ISDA, and the Silver Institute for all their constructive support of the LBMA
> during this consultation process.  We will work in partnership with the CME
> Group, Thomson Reuters and price participants to implement the solution in time
> for testing in early August and go live on the 15th August.[86]

---

[79] Presentation at http://www.lbma.org.uk/assets/events/TRCME%20public.pdf.

[80] Presentation at
http://www.lbma.org.uk/assets/events/bloomberg%20public%20update.pdf.

[81] Presentation at http://www.lbma.org.uk/assets/events/ICE%20public.pdf.

[82] Presentation at http://www.lbma.org.uk/assets/events/LME%20public.pdf.

[83] Presentation at http://www.lbma.org.uk/assets/events/Platts%20public.pdf.

[84] Press release, *LBMA Silver Price Solution: CME Group & Thomson Reuters*, LONDON
BULLION MARKET ASSOCIATION (July 11, 2014),
http://www.lbma.org.uk/_blog/lbma_media_centre/post/silverpricesolution/.

[85] Ms. Crowell is a 2002 graduate of Kenyon College, where she majored in English.
After two years as a paralegal at Norton Rose and an internship at UN Watch, Ms. Crowell
joined the LBMA in 2006.  LinkedIn Profile, https://www.linkedin.com/pub/ruth-
crowell/21/256/451.

[86] Press release, *LBMA Silver Price Solution: CME Group & Thomson Reuters*, LONDON
BULLION MARKET ASSOCIATION (July 11, 2014),
http://www.lbma.org.uk/_blog/lbma_media_centre/post/silverpricesolution/.

156.    The CME also issued a press release upon winning the bid:

LONDON, July 11, 2014 /PRNewswire/ -- CME Group, today released the following statement regarding the London Bullion Market Association's London Silver Price Market Consultation:

"We are honoured to have been appointed by the OTC silver market participants and the London Bullion Markets Association to provide an electronic solution that will transform the London OTC silver spot price," said William Knottenbelt, Senior Managing Director, EMEA (Europe, Middle East, Africa) for CME Group. "CME Group's transparent, transaction-based OTC auction platform, combined with Thomson Reuters' independent Benchmark Administration services will deliver a strong London footprint, a deep understanding of the silver markets, and a fully IOSCO-compliant, FCA-regulated solution to the London bullion marketplace.  As an industry leader in precious metals price discovery, we understand how important the silver spot benchmark is to the physical metals industry, and we look forward to continuing to engage with key metals industry stakeholders to deliver our new solution on August 15th."[87]

157.    Thomson Reuters too issued a press release on August 5, 2014:

The silver market is set for a historic makeover as Thomson Reuters and the CME Group are set to operate the new LBMA Silver Price from 15 August, as the current 117-year old process comes to an end.

The silver fix – which is used by producers, consumers and investors on a daily basis – is currently set every day at noon by three banks via a conference call, working out a price at which their customers are willing to buy and sell the metal. A City of London Institution, the silver fix is used to price for mining sales contracts and exchange-traded funds.

The London Bullion Market Association (LBMA) confirmed that the existing daily silver fix, will be replaced on August 15 by the new LBMA Silver Price with CME Group providing a price platform and methodology, with Thomson Reuters responsible for administration and governance.

---

[87] Press Release, *CME Group Statement on LBMA London Silver Price Market Consultation*, CME GROUP (July 11, 2014), http://cmegroup.mediaroom.com/index.php?s=43&item=3529.

The new method offers an auction-based, auditable electronic system that will match buying and selling orders to reach a benchmark for the price of silver. All of the auctions can be viewed live on Thomson Reuters flagship desktop, Eikon.[88]

### 3.    The LBMA Silver Price Launched on August 15, 2014

158.    On August 15, 2014, the "replacement" of the Silver Fix began.  Just prior, "[i]n a small boardroom at the LBMA's London offices, a large plasma screen stared blankly," reported the Wall Street Journal.[89]  "'Give it a few seconds,' said Ruth Crowell, chief executive of the London Bullion Market Association, at 11:59 am U.K. time Friday. . . . The clock struck 12pm. After a few moments of inertia, the platform ticked into life and, after a brief auction, the first-ever electronic silver fix was generated: $19.86 per troy ounce."[90]  The LBMA announced:

On 15 August, CME Group and Thomson Reuters launched the new LBMA Silver Price, in partnership with the London Bullion Market Association (LBMA). CME Group provides the electronic auction platform on which the price is calculated and Thomson Reuters is responsible for administration and governance of the benchmark as well as distribution. The LBMA accredits the market participants.

In order to enable a seamless transition for the OTC silver market, the new process for the LBMA Silver Price maintains continuity with the previous global spot benchmark the London Silver Fix, that existed for 117 years. The fully electronic auction platform increases the transparency of the price-setting mechanism and allows for a wider number of banks, trading houses, refiners and producers to participate.[91]

159.    Ruth Crowell, CEO of the LBMA further commented:

---

[88] Press Release, *The new LBMA Silver Price heralds a new era in precious metals benchmarks*, THOMPSON REUTERS (Aug. 5, 2014), http://blog.financial.thomsonreuters.com/new-silver-fix-heralds-new-era-precious-metals-benchmarks/.

[89] *A Glimpse of the Future as Silver Breaks 117-Year Tradition*, THE WALL STREET JOURNAL (Aug. 15, 2014), http://blogs.wsj.com/moneybeat/2014/08/15/a-glimpse-of-the-future-as-silver-breaks-117-year-tradition/.

[90] *A Glimpse of the Future as Silver Breaks 117-Year Tradition*, THE WALL STREET JOURNAL (Aug. 15, 2014), http://blogs.wsj.com/moneybeat/2014/08/15/a-glimpse-of-the-future-as-silver-breaks-117-year-tradition/.

[91] LBMA Website, http://www.cmegroup.com/international/emea/lbma-silver-price.html.

I am delighted that the first LBMA Silver Price will be launched today. This is the culmination of an intense three month period of consultation, discussions and preparation. I would like to take the opportunity to thank all those who have been involved in the process. The LBMA has been overwhelmed with the support that it has received from its partners, CME Group and Thomson Reuters as well as LBMA members and other participants in the wider market.[92]

160.    THE WALL STREET JOURNAL reported of the launch: "With the unveiling of London's shiny, new silver benchmark Friday, metal producers and traders are hoping to head off lingering concerns about the credibility of the market.   But as the price-setting process undergoes the first major overhaul in more than a century, there are signs the revamped process isn't quite ready."[93]

### 4.    The LBMA Methodology

161.    The LBMA describes the new system as follows:

The LBMA Silver Price is determined via an electronic auction based solution which is based on transactions and is auditable. Five price participants have been accredited to contribute to the LBMA Silver Price: HSBC Bank USA NA, JPMorgan Chase Bank, Mitsui & Co Precious Metals Inc., The Bank of Nova Scotia - ScotiaMocatta and UBS. The LBMA Silver Price is set in a series of auction rounds with each round lasting 30 seconds. The auction begins at 12:00 and participants input their buy volume and sell volume orders in lakhs (100,000 ounces) or quarter lakhs (25,000 ounces). The initial price at the start of the process is likely to be close to the spot price. In the first round the system algorithm will attempt to match buy and sell orders within the permitted tolerance level of 300,000 ounces (or 3 lakhs). If the buy and sell orders are out of tolerance, the auction price will change and the auction will restart. The process will continue until the buy and sell volumes are in tolerance and the equilibrium price is set.[94]

---

[92] Press Release, *CME Group, LBMA and Thomson Reuters launches the first LBMA Silver Price today*, LONDON BULLION MARKET ASSOCIATION (Aug. 15, 2014), http://www.lbma.org.uk/_blog/lbma_media_centre/post/the-first-lbma-silver-price/.

[93] Concerns Remain Ahead of New Silver Benchmark Debut, THE WALL STREET JOURNAL (Aug. 14, 2014), http://online.wsj.com/articles/concerns-remain-ahead-of-new-silver-benchmark-debut-1408043599#printMode.

[94] LBMA Website, http://www.lbma.org.uk/pricing-and-statistics.

### 5.    Concerns over the "New Fix"

162.    Concerns have been expressed that the process for choosing the replacement were less than transparent.  To start, some have questioned the independence of the Silver Fix and the LBMA, given that the LBMA announced it would be taking over the search for a replacement on the same day that the Silver Fix announced it would be shutting down.  In addition, it was not until August 15, 2014 that the members of the new panel were announced and two of three original panelists were HSBC and Scotiabank, each of which is a Market Making member of the LBMA and sits on the LBMA executive and regulatory committees.

163.    In between, concerns have been expressed as to the transparency of the selection process, potential conflicts of interest, and that though there is now electronic trading, presents only a modest change, and, moreover, is technically problematic.  It is reported that some have "likened the user interface of the new CME/Thomson Reuters silver trading platform to something from a command prompt MS-DOS user interface from the 1970s."[95]

164.    One significant concern is "independent review" of the proposals by CME/Reuters, Bloomberg, the LME, Platts, and others.  The independent review was conducted by Jonathan Spall,[96] who worked in precious metals at Barclays until earlier this year.[97]  Barclays

---

[95] *New 'LBMA Silver Price' Farce – Still Shockingly Non-Transparent*, ZERO HEDGE (Aug. 17, 2014), http://www.zerohedge.com/news/2014-08-17/new-%E2%80%98lbma-silver-price%E2%80%99-farce-still-shockingly-untransparent.

[96] *CME, Thomson Reuters win battle to replace century-old silver benchmark*, REUTERS (July 11, 2014), at http://www.reuters.com/article/2014/07/11/us-silver-fix-idUSKBN0FG14A20140711.

[97] *Barclays head of spot gold trading leaves bank –sources*, REUTERS (May 20, 2014), at http://www.reuters.com/article/2014/05/20/idUSL6N0O63OT20140520.

was fined $44 million by the FCA for gold market manipulation in connection with the Fix.[98] Mr. Spall, after conducting his independent review of the new silver fix, was named the head of the London Platinum and Palladium Fix.[99]

165.    It appears that THE FINANCIAL TIMES was indeed accurate in reporting that while losing the "unfortunate name," in favor of a bland one, and the "private teleconference," in favor of electronic trading, "anyone thinking there has been a complete change in the way the daily snapshot of the silver market is conducted would be mistaken."[100]

## X.    ECONOMIC EVIDENCE FURTHER SUPPORTS COLLUSION AND MANIPULATION OF THE SILVER FIX DURING THE CLASS PERIOD

### A.    Expert Analysis Reveals Systematic Suppression of Spot Market Silver Prices Throughout the Class Period

166.    Plaintiffs have retained Professor Rosa Abrantes-Metz of the New York University Stern School of Business, perhaps the most prominent academic in the world on benchmark manipulation.  Her work was instrumental in uncovering the manipulation of LIBOR which has since lead to a global investigation of interest rate benchmarks and massive fines related to this manipulative conduct.[101]  Professor Abrantes-Metz analyzed the Silver Fix and its impact on prices in the silver market and studied the price movements around the start of the

---

[98] *Barclays Fined Over Gold Fixing U.K.*, THE WALL STREET JOURNAL (May 23, 2014), http://online.wsj.com/articles/SB10001424052702303480304579579360337255896.

[99] *Jonathan Spall to Chair Platinum to Palladium Fixings*, BLOOMBERG (Aug. 4, 2014), http://www.bloomberg.com/news/2014-08-04/jonathan-spall-to-chair-platinum-to-palladium-fixings.html.

[100] *New silver price is 'improvement' on fix*, THE FINANCIAL TIMES (July 16, 2014), http://www.ft.com/intl/cms/s/0/4053ff04-0ccb-11e4-90fa-00144feabdc0.html#axzz38yxp1nAQ.

[101] *See, e.g.*, R. Abrantes-Metz, M. Kraten, A. Metz, & G. Seow, *LIBOR Manipulation?* JOURNAL OF BANKING & FINANCE 36 (2012), 136-150 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1201389).

Silver Fixing at 12:00 P.M. London time, looking for outliers as well as signs of systematic price suppression.

167.    Professor Abrantes-Metz started by examining the normalized average price of spot market silver between January 1, 2001 and July 31, 2014.   This analysis is intended to capture the average pattern of price changes throughout the day.   The results are displayed in Figures 4 through 31 below.   These charts show the normalized average spot market silver price for two different groups of days between January 1, 2001 and July 31, 2014.   The first group, represented by the red line, depicts the average price per minute across the year for days in which the silver spot price at 12:00 P.M. London time, *i.e.*, the start of the Silver Fix, is greater than the Silver Fix price.   The second group, represented by the blue line, shows the average normalized price for the same year over the subset of days for which the silver spot price at 12:00 P.M. London time is less than or equal to the Silver Fix price.

168.    Figures 4 through 31 show an unusually large downward price spike at the time of the Silver Fixing.   These spikes occur during nearly every year for days in the "red group," where the price of silver is higher than the Fix at 12:00 P.M. London time.   However, the same downward spike is also observed for days in the "blue group," where the price of silver is actually *less than or equal to* the Fix at 12:00 P.M. London time, only that in this case the downward spike occurs on average a few minutes prior to 12:00 P.M.   These price spikes intensify beginning in 2004, as the decrease in price observed get significantly larger, particularly on days in the red group where the price of silver is higher at the start of the Silver Fix.

**FIGURE 4**



**FIGURE 5**



**FIGURE 6**



**FIGURE 7**



**FIGURE 8**



**FIGURE 9**



**FIGURE 10**



**FIGURE 11**



**FIGURE 12**



**FIGURE 13**



**FIGURE 14**



**FIGURE 15**



**FIGURE 16**



**FIGURE 17**



**FIGURE 18**



**FIGURE 19**



**FIGURE 20**



**FIGURE 21**



**FIGURE 22**



**FIGURE 23**



**FIGURE 24**



**FIGURE 25**



**FIGURE 26**



**FIGURE 27**



**FIGURE 28**



**FIGURE 29**



**FIGURE 30**



**FIGURE 31**





**FIGURE 32**

165.    Professor Abrantes-Metz further analyzed whether the apparent suppression of silver prices persisted beyond the few minutes of a few days where abnormally large price movements were identified.  For this analysis, she calculated how often in any given year the silver spot price at 12:00 P.M. London time was greater than the Fix released a few minutes later, indicating that silver prices declined during the Fixing.

166.    In a normal market, silver prices should exhibit a "random walk" over short intervals, with prices increasing 50% of the time and decreasing 50% of the time, around the start of the Silver Fixing.  Figure 32 displays the behavior of spot market silver prices following the Silver Fixing during each year from 2001 through 2014.  In every year except for 2010, the percentage of days where the price of silver decreases during the call is significantly larger, at times reaching 60%, 70% or even 80% of the days during that year.

73



**FIGURE 33**

167.    Figure 33 displays the average dollar increase in price and average dollar decrease in price over the same set of days analyzed in Figure 32.  This chart shows that in absolute dollar terms, the size of the price decreases are on average significantly larger than the size of the price increases.  Putting Figures 32 and 33 together, price decreases around the Silver Fix are not only more likely than price increases but of greater size when they occur.



**FIGURE 34**

169.    Figure 34 demonstrates the difference in size between the price increases and price decreases around the Silver Fix.  In some years, like 2001 and 2002, the size of the price decreases are 2.5 times larger than the size of the price increases when they occur.  Throughout this year, until the end of July 2014, the average drop in price has been approximately 2 times larger than corresponding price increases. For the remaining years, on average, the size of price decreases around the Silver Fixing have been 1.5 larger when they occur than corresponding price increases.



**FIGURE 35**

170.    Figure 35 further highlights the asymmetry between price increases and decreases around the Silver Fixing by showing that not only is the absolute dollar change larger, as indicated in Figure 33 above, but so is the percentage change in price.  Figure 35 demonstrates that the red bars, which show the percent decrease in silver prices, are significantly larger during most years than the blue bars, which represent the percentage price increase.  This is consistent with the Figure 34 above, displaying the ratio of the size of price decreases to price increases around the Silver Fix.



**FIGURE 36**

171.   Figure 36 contains an example of one day during which the spot price of silver dropped significantly around the Silver Fixing.  Additional examples, displaying the change in both spot silver prices and the prices of COMEX silver futures contracts are attached to the complaint as Appendix A.  On November 25, 2009 the price of COMEX silver futures contracts and spot market silver begin to decrease around 11:40 A.M. London time, roughly 20 minutes *before* the start of the Silver Fixing.



**FIGURE 37**

173.    Figure 37 shows the evolution of spot silver prices between 11:38 A.M. and 11:44 A.M. London time, on November 25, 2009.   During this time period three banks, UBS, BNP Paribas, and Defendant Deutsche are actively quoting silver prices in the spot market around the time of the Silver Fixing.

174.    As shown in Figure 37, prior to 11:40:13 A.M., the price of silver in the spot market was increasing until, at 11:40:13 A.M. London time, Defendant Deutsche submits a price quote, represented by the midpoint of its bid and ask quote, that is substantially lower than the prevailing quotes in the market at that time.   This lower price quote by Deutsche coincides with a change in the trend of spot silver prices, which continue to decrease throughout the Silver Fixing.



**FIGURE 38**

175.     Leading up to the beginning of the Silver Fixing, Figure 38 shows that Defendant Deutsche again places price quotes lower than prevailing market prices, this time at 11:59:44 A.M., which starts a reversion in the spot market price trend.   Figure 38 demonstrates that following Deutsche's price quote at 11:59:44 A.M., prices start moving downward into the beginning of the Silver Fixing.   Throughout the Fix, Deutsche continues to place quotes on the lower end of other contemporaneous price quotes in the market, leading the price of silver consistently lower than preceding quotes by other market participants.   This demonstrates that Defendants can and do use the spot silver market to influence silver prices for their own financial benefit.

176.    November 25, 2009 is also significant because it is the last tradable day for active silver futures contracts expiring during that month.  Such key dates for futures contracts provide an incentive to move prices on those days to possibly benefit "rolling" futures position, *i.e.*, moving those positions expiring during this month to the next active contract month.

177.    Professor Abrantes-Metz also analyzed silver prices from January 1, 2007 through June 30, 2014 around these key expiration dates.  Approximately 20% of those days presented suspicious price movements consistent with price artificiality.

178.    The systematic price suppression and manipulative spot market conduct identified by Professor Abrantes-Mets demonstrates that throughout the Class Period, Plaintiffs and Class Members transacted in silver and silver derivatives, including silver futures and options contracts, at artificial prices proximately caused by Defendants' manipulative conduct and as a result suffered legal injury.

**B.      Expert Analysis Has Identified Anomalous Silver Pricing Behavior at the Time of the Silver Fixing**

179.    Plaintiffs have retained Andrew Caminschi, a researcher at the University of Western Australia, who is an expert in the Silver Fixing and the markets for silver and silver-based derivatives.  Mr. Caminschi analyzed intraday price quotes for spot market silver, Bloomberg ticker symbol "XAG," and the trade and quote data for COMEX silver futures contracts, Bloomberg ticker symbol "SI," between January 1, 2000 and December 31, 2013.[102]

180.    Mr. Caminschi's analysis uncovered anomalous pricing behavior around the time of the Silver Fixing that was consistent with a systemic suppression of silver prices.

181.    This anomalous pricing behavior was accompanied by market activity in both the COMEX silver futures market and spot market for physical silver, demonstrating that

---

[102] *See* Caminschi, *Silver Linings*, *supra* note 15.

information regarding the outcome of the Silver Fixing was being "leaked" to the market prior to the end of the daily conference call.

182.    This information leakage, which manifest itself in the form of abnormally large spikes in both trading volume and price volatility in the minutes immediately following the start of the Silver Fixing, created a significant advantage to "informed traders," those with knowledge of the Fix, compared to uninformed market participants.

       **1.**      **Silver Prices Consistently Decrease Around the Start of the Silver Fixing**

183.    Between January 1, 2000 and December 31, 2013, there is a sharp divergence between the open market silver prices, for both spot market silver and silver futures contracts, and those of the Silver Fix.  On January 1, 2005, silver began a historic bull run, increasing from $6.78 per ounce to close at $48.44 on April 28, 2011.



**FIGURE 39**

184.   During this time period, while the price of silver was increasing, the Silver Fix was consistently inducing a price drop.  The net effect of this can be seen in Figure 39, which displays the cumulative unadjusted returns for COMEX silver futures contracts between January 1, 2007 and December 31, 2013.  Unadjusted returns measure the impact on silver prices by determining the price increase or decrease for a long position over a specified length of time.  Thus, a decrease in unadjusted returns for COMEX silver futures contracts represents a decrease in price.  As such, the cumulative unadjusted returns represent a nominal intraday price level.

185.    Figure 39 above demonstrates that the intraday price level of COMEX silver futures prices begin to decrease just prior to the start of the Silver Fixing and reach on average the lowest level of the day, about 10 basis points lower, just a few minutes after the start of the Silver Fixing.



**FIGURE 40**

186.    This statistically significant price drop is highly suspect given that it occurs at a time when silver prices were generally increasing.  Figure 40 displays the spot market price of silver between January 1, 2000 and November 11, 2014, and show that from at least 2005, through 2012, the price of silver was trending higher.  Against this backdrop, the price of silver consistently drops during the Silver Fixing, in contrast to the uptrend visible in the broader public silver market.



**FIGURE 41**

188.   This disconnect, between the price of silver during the Silver Fixing and prices in the broader public market is highlighted by the frequency with which the silver prices decrease around the start of the Silver Fixing.  Figure _ displays the proportion of days with negative returns, *i.e.* price decreases, to those with positive returns, *i.e.*, price increases, observed during the Fix.  Figure 41 demonstrates that during <u>every year</u>, even during silver's bull run, there are more days where the price of silver decreases during the Silver Fixing than there are days where the price increases.  Often, the number of down days outnumber the number of up days 2 to 1.  That is, the price dynamics of the Silver Fix did not reflect those of the broader silver market.



**FIGURE 42**

190.   This results in significantly different returns during the Silver Fixing than observed across the trading day.   The Figure 42 compares the average daily returns for spot market silver to the returns during the Silver Fixing.   Significantly, between 2002 and 2010, while silver was on a bull run, during every year expect for 2008, the average Silver Fixing returns were negative, representing a decrease in price, while the average daily returns in the broader public market were positive, demonstrating an increase in price.   Figure 42 underscores how divergent the Silver Fixing price dynamics are in comparison to the broader public silver markets.



**FIGURE 43**

192.     The negative returns generated during the Silver Fixing are highly statistically significant, and cannot be attributed to general market noise. Figure 43 measures the statistical significance of unadjusted returns in the COMEX silver market, between January 1, 2007 and December 31, 2013, at the 95%, 99%, and 99.9% confidence interval.  Figure 43 demonstrates that there is a statistically significant cluster of negative returns in the minutes prior to the start of the Silver Fixing.  Nowhere else is there such a concentration of negative returns.

193.     This also represents a significant change in intraday silver pricing behavior.  Prior to the start of the Fix, the unadjusted returns occupy a +/-4 basis point wide band, centered on 0 basis points, ranging from +2 basis points to -2 basis point.  In the 10 minutes leading up to the start of the Fix, the unadjusted returns breakout from this band, with subsequent 5 minute intervals drops.  All of these are outside of the 99.9% confidence band, indicating these are not random occurrences.

**2.    Anomalous Spikes in Both Trading Volume and Price Volatility Following the Start of the Silver Fixing Demonstrate Information Leaking to the Market**

194.    In studying the market reactions to the Silver Fixing, Caminschi selected a broad 14 year study period of January 1, 2000 through December 31, 2013.  This time period covers a major structural change in the silver market: the introduction of contemporaneous electronic futures trading.  In December 2006, COMEX silver futures contracts began trading electronically on the CME's Globex platform, expanding the trading hours of COMEX silver futures contracts.  This specifically enabled trading during the Silver Fixing.  Prior to the introduction of Globex, COMEX silver futures contracts were predominantly traded in open outcry auctions on the floor of COMEX, between 8:25 A.M. and 1:25 P.M. Eastern Standard time, which did not overlap with the Silver Fixing.  While "out of pit" hours trading had been available previously under the NYMEX ACCESS platform, there was limited market engagement.



**FIGURE 44**

195.    Figure 44 shows the average volume of COMEX silver futures contracts traded during 11:30 A.M. and 12:30 P.M London time between January 1, 2007 and December 31, 2013.  This chart shows the trading volume beginning to increase just prior to the start of the Silver Fixing and spiking at 12:02 P.M. London time.   Trading volume during this period increases more than threefold, from around 15 contracts per minute before the start of the Fixing to over 50 contracts per minute just 2 minutes after it starts.

196.    Because the average length of the Silver Fixing is around 4 minutes, in almost all cases, this spike in volume occurs before the end of the Silver Fixing.  The percentage of fixings completed relative to the spike in trading volume is indicated in Figure 44 with a series of vertical red lines.  The observed spike in volume occurs after roughly 10% of the fixings have completed.  This behavior is highly unusual since typically, trading volume increases in response to new information, *e.g.*, the result of the Silver Fixing.  This premature spike in volume

88



**FIGURE 45**

indicative of information leaking from inside the Silver Fixing to the public market as the Fixing

Participants trade on results of the Fix before it is released to the public.

197.    Further indications of information leaking from the Fix can be seen in the changes

in price volatility observed in the silver spot market.  Figure 45 displays the average relative

price volatility in silver spot market between 11:30 A.M. and 12:30 P.M. London time from

January 1, 2007 through December 31, 2013.  Like the observed increase in trading volume

observed in the COMEX silver futures market, price volatility in the silver spot market peaks just

2 minutes after the start of the Silver Fixing, escalating by close to 40%, while almost 90% of the

fixings are still in progress, their results not yet public.

198.    Volatility spikes are also markers of new information arriving to the market. As a

result, an increase in volatility prior to the end of the Fix is most plausibly explained by

information leaking into the market as the Fixing Members act on the results of the Fix prior to

its publication.

89



**FIGURE 46**

199.    In addition to these unexpected spikes in volume and volatility, the returns around the start of the Fix also consistently predict the Fix direction.  Figure 46 contains two charts demonstrating the predictive power of trades placed in the COMEX silver futures market during the 20 minutes before (-20 to 0) and 15 minutes after (0 to 15) the start of the Silver Fixing between January 1, 2007, and December 31, 2013.

200.    The top chart represents the percentage of Silver Fixings for which the price direction (*i.e.*, higher or lower than the price of silver before the start of the Silver Fixing) was correctly predicted by the market price direction (*i.e.*, increasing or decreasing) during the specified time interval.  The solid black line displays the total percentage of Silver Fixings, still ongoing at that time, where the Fix direction was correctly predicted by the market price direction.  The black and white vertical bars represent the percentage of correct predictions for

90

the two subsets of Fixes, those where the fix price movements were "small," and those where the absolute returns were "large."

201.    The lower chart in Figure 46 shows the number of Silver Fixings included in the analysis at time each interval.  Significantly, the analysis in Figure 46 only measures the ability of market direction to predict the results of those Silver Fixings which are still ongoing at each point in time, *i.e.*, prior to the information release, since one would expect trades placed after the end of the Fix to reflect the price released to the market.  With the average length of the Silver Fixing around 5 minutes, the bottom chart in Figure 46 reflects the significant drop off in the number of ongoing Fixes during each of the 15 minutes following the start of the Fix.

202.    Figure 46 shows that trades placed just after the start of the Silver Fixing, but before the results are released to the public, are highly predictive of the Fix direction.  During the 20 minutes prior to the start of the Silver Fixing, market activity has a limited predictive value, correctly predicting the price direction of the Fix about 40% of the time.  However, once the Fix starts, trades in the minutes before the Fix is released to the public are highly predictive of the Fix direction, reaching a peak 83.6% accuracy seven minutes after the start of the Silver Fixing.

203.    The predictive value increases even further when there are large returns, *i.e.*, more than 5 basis points on average, to be gained by trading in advance of the public release of the Fix.  The white vertical bars in Figure 46 report the ability of market activity to predict the results of Silver Fixings that generate these large returns and demonstrate more than 90% accuracy for trades placed during the 2 to 7 minute intervals, reaching 96.9% accuracy during minute 5.

204.    Figure 46 also show that trades in the opening 5 minutes of the Fixing are highly informed as to the ultimate Fix direction.  Further the more economic gains to be had, *i.e.*, the larger the returns, the better the trades are at predicting the final outcome of the Fix.



**FIGURE 47**

205.    Fix price quotes in the silver spot market also exhibit similar predictive power. Figure 47 displays bid and ask quotes in the silver spot market between 11:45 A.M. and 12:15 P.M. London time on December 29, 2009.  During this time period, Defendants Bank of Nova Scotia and Deutsche Bank, represented by "BNS" and "DB" respectively, are both actively quoting prices in the spot silver market.  For more than two minutes prior to the release of the Fix, as indicated by the solid black dot, both Defendants quotes silver prices at the Fix level. This is indicative of the same kind of information leaking into the public market though the Fixing Members activity in advance of the public release of the Fix.

### 3. Informed Traders with Knowledge of the Fix Benefit Financially by Taking Advantage of the Observed Pricing Anomalies

206. The pricing anomalies described above provide "informed trades" who have knowledge of the Fix price direction with a considerable advantage over "uninformed traders" who hold long positions in the COMEX silver futures and spot silver markets. The returns available to an informed trade are represented by what is known as "adjusted returns." The adjusted returns take the unadjusted returns described earlier and impute knowledge of the Silver Fixing direction, *i.e.*, whether the Fix will be higher or lower than the price of silver before the start of the daily fixing call. The adjusted returns available to these informed traders also represents the returns available to the Defendants, who as Silver Fixing Members, gain knowledge of the Silver Fixing price direction prior to its to the public.

207. However, the true significance of the informational advantage enjoyed by an informed trader in the silver market is represented by the "difference in returns," *i.e.*, the difference between the adjusted returns available to informed traders, with directional insight into the results of the Silver Fixing, and the unadjusted returns of uninformed traders with no directional insight, holding uninformed long positions.



**FIGURE 48**

209.    Informed traders also enjoy a significant advantage in the COMEX silver futures market.  Figure 48 displays the cumulative difference in returns experienced by an informed trader with direction insight into the results of the Fix and an uninformed trader with no direction insight, between 11:00 A.M. and 1:00 P.M. London time during the Class Period.

210.    As seen in the spot market, there are statistically significant advantages available to informed traders on either side of the Silver Fixing.  For example, an informed trader that initiates a position at 11:45 A.M., when the average returns are -10 basis points, and closes that position at 12:05 P.M., when returns are +15 basis points, captures the entire 25 basis point price move as advantage over an uninformed trader.



**FIGURE 49**

211.     Figure 49 displays the cumulative difference in returns observed in the spot silver market between 11:00 A.M. and 1:00 P.M. London time.   Following the black line, which indicates the average difference in returns in 2011, Figure 49 shows that there are advantages on both sides of the Silver Fixing available to informed trades.   At its maximum, the informed trader has more than 40 basis point advantage over the uninformed trader; slightly more than 20 basis points on either side of the Fix.



**FIGURE 50**

213.     Comparing the returns generated by informed silver traders to those observed elsewhere puts the value of this advance directional insight in perspective.  Between 2000 and 2013, the price of silver increased from $5.14 to $19.50 per ounce, a return of more than +4 basis points per day.  Over the same period, the S&P 500 index returned even less, just 0.7 basis points per day.  As demonstrated in Figures 48 and 49 above, an informed trader outperformed the uninformed trader by around <u>25 basis points per day</u> in the COMEX silver futures market between 2007 and 2013 and more than <u>40 basis points per day</u> during 2011.  A return of just 10 basis points per day results in an annual return of 28% per year, while a 40 basis point return, as observed in the spot market during 2011, amounts to a 172% annual return.

214.     Advance knowledge of the Fix direction allows informed traders to consistently generate these kinds of returns.  Figure 50 shows the difference in returns for informed and uninformed traders, between 2000 and 2013, with color.  Areas of positive returns are indicated with shades of green and areas of negative returns with shades of red.  Noticeably, since 2000,

96

the 2 minute window after the start of the Fix shows a positive return for informed traders during all but one of the 56 calendar quarters.

215.    In total Caminschi's analysis demonstrates that the pricing dynamics observed around the Silver Fix are not the result of random market activity and are most plausibly explained trades being placed by informed market participants, like the Defendants, who use their knowledge of the Fix to generate significant returns on a daily basis.

216.    This kind of informed trading adversely impacts the market positions of uninformed long traders who are subject to the systematic price suppression that occurs around the Silver Fix.   Together, with Professor Abrantes-Metz findings, this economic evidence demonstrates that throughout the Class Period Plaintiffs transacted in silver and silver based derivatives at artificial prices proximately caused by Defendants' manipulative conduct and suffered legal injury as a result.

**C.    Computer Analysis of COMEX Silver Futures Market Data has Identified Activity Around the Silver Fix Consistent with Informed Trading**

217.    To further support this expert economic analysis Plaintiffs used proprietary software to analyze the time and sales or "tick" data for COMEX silver futures contracts during the period of 11:55 A.M. - 12:05 P.M. London time (the "Target Window") for each trading day between January 1, 2007 and August 14, 2014 (the "Analysis Period").   Plaintiffs selected this ten minute window because it includes trading activity during the Silver Fixing, which begins at noon London time, but prior to the publication of the Silver Fixing's results to the general public, which occurs on average at 12:04 P.M. London time.

218.    The analysis split the Target Window into two halves, the five minute period before the start of the Silver Fixing, 11:55 A.M. - 12:00 P.M. London time (the "Pre-Fixing

Window"), and the five minute period after the start of the Silver Fixing, 12:00 P.M. – 12:05 PM London time (the "Post-Fixing Window").

219. Plaintiffs then calculated average price trend for COMEX silver futures contracts during the Pre-Fixing Window and compared that to the average price trend during the Post-Fixing Window on days within the Analysis Period where the total trading volume during the Target Window was at least 100 contracts. Plaintiffs next screened for days where the slope of the price trend observed during the Pre-Fixing Window changed direction during the Post-Fixing Window. Plaintiffs further narrowed the results to include only those days where the change in slope was accompanied by an increase in trading volume during the Post-Fixing Window.

220. The combination of a directional change in price trend and an increase in trading volume during the Post-Fixing Window is consistent with information leaking from the Silver Fix to the public market as informed traders act on their knowledge of the Fix by placing trades in the COMEX silver futures market before the Fix is released to the public. This trading pattern, which was first identified by Plaintiffs' expert Mr. Caminschi, provides a considerable financial advantage to informed traders with knowledge of the Fix when compared to uninformed long silver market participants. *See* Part 10.B *supra*.

221. Plaintiffs' analysis uncovered 481 days throughout the Analysis Period where market activity in the nearby most active COMEX silver futures contract around the start of the Silver Fix met the pattern described above.



**FIGURE 51**

222.   For example, Figure 51 illustrates the price and volume of the March 2009 COMEX silver futures contract between 6:55 A.M. and 7:05 A.M. Central Standard Time ("CST") on December 2, 2008.  Figure 51 shows a significant spike in trading volume beginning at 6:00 A.M. CST, coincident with the start of the Silver Fix.  This spike in volume is significant, increasing almost fivefold from an average 5 contracts per minute prior to the start of the Fixing to almost 25 contracts per minute after the Fixing starts.

223.   On December 2, 2008, the Silver Fix was $9.41 per troy ounce, greater than the price of COMEX silver futures contracts at the start of the Fixing call.  However, the price of COMEX silver futures contracts still decreased on heavy volume once the Fix started.  This is consistent with the informed trading patterns described by Mr. Caminschi in Part 10.B *supra*.



**FIGURE 52**

224.    Similarly, Figure 52 shows the price and volume changes for the March 2010 COMEX silver futures contract on December 23, 2009, another day identified by Plaintiffs' proprietary data mining software.  In this chart, the price of COMEX silver futures begins to decrease around 5:59 A.M. CST, just before the start of the Silver Fix, on increasing volume. Once the fix starts, trading volume more than quadruples during the first 2 minutes, increasing from less than 5 contracts per minute to 25 contract per minute between 6:00 A.M. and 6:01 A.M. CST, and 30 contracts per minute between 6:01 A.M. and 6:02 A.M. CST

225.    On December 23, 2009, the Silver Fix was $16.92 per troy ounce, lower than the price of COMEX silver futures contracts at the start of the Fixing call.  Thus the decrease in COMEX silver futures contracts on increasing volume during the first two minutes following the

start of the Fix correctly predicted the Fix direction on this day. This is consistent with Caminschi's observations that trades placed in the market after the start of the Fix are highly predictive of the Fix results and indicative of trading by informed trades, like the Defendants.

226. Other days identified by Plaintiffs' proprietary software produced similar results, correctly predicting the direction of the Silver Fix almost 75% of the time. The predictive power of trading on these days is further evidence of trading by informed traders, like the Defendants, who used their knowledge of the Fix throughout the Class Period for their own financial benefit at the expense of Plaintiffs and Class Members.

## XI. ANY OTHERWISE APPLICABLE STATUES OF LIMITATIONS ARE TOLLED BY DEFENDANTS' ACTIVE AND FRAUDULENT CONCEALMENT

227. Plaintiffs' disclaim any burden to plead facts regarding the statute of limitations.

228. The statute of limitations relating to the claims for relief alleged herein have been tolled because of fraudulent concealment by reason of Defendants' active and inherently self-concealing conduct. Plaintiffs' and members of the Class had no knowledge of Defendants' unlawful and self-concealing collusive, manipulative, and inequitable acts and could not have discovered them by the exercise of due diligence prior to the time Deutsche Bank announced its withdrawal from Silver Fixing in January 2014. Plaintiffs thus assert the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiffs. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

229. Active acts of concealment by Defendants to conceal their violations of law from Plaintiff and the Class include, *inter alia*, avoiding discussing the manipulation of the Silver Fixing in public forums and, when doing so, providing the public false and misleading information about the Silver Fixing.

101

230.    By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing.   By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiff and members of the Class has been and are tolled.

231.    Moreover, Defendants actively concealed their conspiracy by placing a barrier for the public to access much of the information on the Silver Fixing website, www.silverfixing.com.   Upon visiting the website, the public was greeted ominously.   Visitors were allowed to see nothing without entering into "Terms and Conditions," which required visitors to enter into an ostensibly onerous "contract" with London Market Silver Fixing, Ltd. Any person or entity wishing to learn about the Silver Fix directly from Silver Price Fixing Limited itself was thus faced with a substantial deterrent to investigation.

232.    Now that Silver Fixing has ended, the Silver Fixing website has been taken down. Certain information has been archived, including the front page of the Silver Fixing website, which bears an uncanny resemblance to that of the Gold Fixing website:

## XII.   CLASS ACTION ALLEGATIONS

233.   Plaintiffs bring this action on behalf of themselvs and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities that held or transacted in physical silver, silver derivatives or other financial instruments directly linked to the price of physical silver, including silver futures and options, exchange traded funds, and over the counter swaps in the United States or its territories at any time from January 1, 1999, through the date on which the effects of Defendants' unlawful conduct cease (the "Class").

234.   Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates.  Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.[103]

235.   Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

236.   Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

237.   Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

238.   Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust, commodity manipulation, and other complex litigation, including involving precious and non-ferrous metals and financial benchmark rate collusion and manipulation.

---

[103] Plaintiffs have defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

239.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to:

     a.   Whether Defendants unreasonably restrained trade in violation of federal antitrust law;

     b.   Whether Defendants unreasonably restrained trade in violation of New York antitrust law;

     c.   Whether Defendants manipulated the price of silver and financial instruments tied to the price of physical silver, such as silver futures, options and other silver-based derivatives;

     d.   Whether Defendants were unjustly enriched;

     e.   The length of the alleged conspiracy;

     f.   Damages suffered by Plaintiffs and members of the Class; and

     g.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

240.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured

persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

241.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

242.    Under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), a federal class action may prosecuted as to the Donnelly Act and other state law claims under Rule 23 of the Federal Rules of Civil Procedure.

## XIII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**CONSPIRACY IN UNREASONABLE RESTRAINT OF TRADE:**
**SHERMAN ANTITRUST ACT**

243.    Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

244.    The combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (as amended).

245.    Alternatively, the combination and conspiracy alleged herein is a quick look or rule of reason violation of Section 1 of the Sherman Antitrust Act.

246.    Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of physical silver and financial instruments tied to the price of physical silver, including COMEX silver futures.

247.    The conspiracy unreasonably restrained trade.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of

trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

248.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

249.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### SECOND CLAIM FOR RELIEF
### CONSPIRACY IN UNREASONABLE RESTRAINT OF TRADE:
### DONNELLY ANTITRUST ACT

250.    Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

251.    The aforementioned acts and practices by Defendants were and are in violation of the New York Donnelly Antitrust Act, New York General Business Law § 340, *et seq*.

252.    It is appropriate to apply New York antitrust law to direct purchases of physical silver and financial instruments tied to the price of physical silver, including silver futures options and other silver-based derivatives, in all fifty states because the illegal conspiracy, overt acts in furtherance thereof, manipulation, and other anticompetitive conduct occurred in New York.

253.    Defendants reside, are registered, conduct significant business, and/or own property in New York, including vast caches of silver bullion.  The COMEX is located in New York.

254.    Defendants' in-state conduct caused substantial out-of-state injuries to Plaintiffs and the proposed nationwide class and had a significant impact on the intrastate commerce of New York.  By way of example, Plaintiff and proposed members of the Class traded silver futures options, and other silver-based derivatives on the COMEX, which were fixed and manipulated by the unlawful actions of Defendants.

255.    As a direct and proximate result, Plaintiffs and members of the Class have been injured in their business and property in that they had to pay artificially high price premiums for primary aluminum.  Unless injunctive relief, including structural injunctive relief, is granted, these violations may continue to reoccur.

256.    It is appropriate to prosecute this state law claim on a class basis under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393 (2010).

### THIRD CLAIM FOR RELIEF
### PRICE MANIPULATION:
### COMMODITY EXCHANGE ACT

257.    Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

258.    Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices in silver and silver derivatives, including COMEX silver futures contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*

259.    Each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.

260.    The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") amended Section 6(c)(1) to the CEA.  Under Section 6(c)(1), codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a

contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, shall promulgate not later than one year after July 21, 2010, the date of enactment of Dodd-Frank.

261.   The CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a), in July 2011.

262.   Defendants also violated CFTC Rule 180.1(a), by *inter alia*, trading silver and silver derivatives, including COMEX silver futures, based on non-public inside information obtained and used by them in breach of their duty as Silver Fixing panel members.  Defendants, as sophisticated market participants responsible for the setting of global silver prices, had a duty to set prices reflective of legitimate supply and demand fundamentals, and not cause, exacerbate or further any manipulation of silver or silver futures prices.  Instead, Defendants abused their position of trust and breached their duties and responsibilities as Silver Fixing panel members to cause a specifically plead price artificiality in silver and silver futures prices.  These acts rendered Defendants' pre-arranged execution of COMEX silver futures positions before and around the Silver Fixing an illegitimate part of the supply-demand equation for the prices of COMEX silver futures contracts and other silver derivatives.

263.   As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial COMEX silver futures contract prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein.  Plaintiffs and members of the Class were further legally injured and suffered injury in fact that they transacted in silver derivatives, including silver futures, options and other silver-based derivatives, in an artificial and manipulated market operating

under the artificial prices caused by the Defendants.  Defendants' conduct is presumed to have caused injury to the Plaintiffs and the Class.

264.    Plaintiffs and members of the Class who purchased or sold silver-based derivatives, including silver futures and options contracts, during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF
## PRINCIPAL-AGENT LIABILITY: CEA

265.    Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

266.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

267.    Plaintiffs and members of the Class are each entitled to actual damages sustained in silver derivatives, including silver futures and options contracts, for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF
## AIDING AND ABETTING: CEA

268.    Plaintiffs incorporate by reference and re-alleges the preceding allegations, as though fully set forth herein.

269.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein.  Each Defendant did so knowing of other Defendants' manipulation of the Silver Fix, and silver futures, options and other silver-based derivatives, and substantially and willfully intended to assist these manipulations to cause the prices of COMEX silver futures contract prices to be artificial during the Class Period, in violation of §22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

270.     Under §13(c)(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

271.     Other persons willfully intended to assist these manipulations to cause the price of silver-based derivatives to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).  They are the agents and unnamed co-conspirators as alleged herein.

272.     Plaintiffs and members of the Class are each entitled to actual damages sustained in silver futures, options, and silver-based derivatives  contracts for the violations of the CEA alleged herein.

### SIXTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### COMMON LAW

273.     Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

274.     Plaintiffs are entitled to recovery under State law for unjust enrichment and disgorgement of profits under common law principles of unjust enrichment in each of the fifty States, excluding Ohio and Indiana, and including Puerto Rico and the District of Columbia.

275.     Each Defendant unjustly enriched itself from its intentional manipulation of silver prices through its conduct and omissions alleged herein, while knowing that Defendants had the ability to cause and that they were causing prices to be set at artificial levels.

276.     Plaintiffs' and members of the Class's detriment and Defendants' unjust enrichment were related to and flowed from the wrongful conduct alleged herein, including, without limitation, Defendants' unlawful, manipulative, conspiratorial, and anti-competitive acts described above.

277.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred by members of the Class, which is entitled to disgorgement of all profits resulting from such manipulation and establishment of a constructive trust from which members of the Class may seek restitution.

278.    Plaintiffs and the Class have no adequate remedy at law to seek restitution under common law principles of unjust enrichment.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully prays the Court for a judgment, as follows:

### A.    Judgment of Violation of the Sherman Antitrust Act

279.    Plaintiffs pray that the Court adjudge and decree that Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 1, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class.

### B.    Standing under the Clayton Antitrust Act

280.    Plaintiffs pray that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, to bring suit for Defendants violations of the Sherman Antitrust Act, 15 U.S.C. § 1.

### C.    Judgment of Violation of the Donnelly Antitrust Act

281.    Plaintiffs pray that the Court adjudge and decree that Defendants violated the New York Donnelly Antitrust Act, New York General Business Law § 340, *et seq.*, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class.

### D.     Judgment of Violation of the Commodity Exchange Act

282.     Plaintiffs pray that the Court adjudge and decree that Defendants violated the Commodities Exchange Act, 7 U.S.C. § 1, *et seq*. and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class.

### E.     Certification of Plaintiff Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure

283.     Plaintiffs pray that the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that he be named a Class Representative, that the undersigned be named Co-Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class.

### F.     Treble Damages

284.     Plaintiffs pray that the Court award three times the damages suffered by reason of Defendants' violations of law.

### G.     Punitive Damages

285.     Plaintiffs pray that the Court award punitive damages.

### H.     Disgorgement and Restitution

286.     Plaintiffs pray that Defendants be made to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiff and members of the Class.

### I.     Costs of Suit

287.     Plaintiffs pray that the Court award reasonable costs of suit.

### J.     Pre- and Post-Judgment Interest

288.     Plaintiffs pray that the Court award pre- and post-judgment interest.

### K.     Reasonable Attorney's Fees

289.     Plaintiffs pray that the Court award reasonable attorney's fees.

**L.**    **Other Just and Proper Relief**

290.    Plaintiffs pray that the Court grants such other, further and different relief as is just and proper.

**XV.    DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and members of the proposed Class, respectfully demands a trial by jury on all issues so triable.

Dated:  November 13, 2014.

Respectfully submitted,

Linda P. Nussbaum (LN 9336)
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: lnussbaum@gelaw.com
          pbarile@gelaw.com

Barbara J. Hart
Vincent Briganti
Geoffrey M. Horn
Christian P. Levis
LOWEY DANNENBERG COHEN & HART
P.C.
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: bhart@lowey.com
          vbriganti@lowey.com
          ghorn@lowey.com
          clevis@lowey.com

*Counsel for Plaintiffs and the Proposed Plaintiff Class*