UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                  :

IN RE: LONDON SILVER FIXING, LTD.,    :  Case No. 14-MD-2573 (VEC)
ANTITRUST LITIGATION                             :
                                                :  ECF CASE
This Document Relates To                   :
*DePaoli, et al. v. The London Silver Market Fixing,*  :  ORAL ARGUMENT REQUESTED
*Ltd., et al.,* No. 14-CV-09068 (VEC)         :

------------------------------------------------------------x

**DEFENDANT UBS AG's MEMORANDUM OF LAW
IN SUPPORT OF ITS INDIVIDUAL MOTION TO DISMISS
PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

 

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

555 Mission Street, Suite 3000
San Francisco, CA  94105
Phone:  (415) 393-8200

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500

*Attorneys for Defendant UBS AG*

May 29, 2015

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................... 2

    I.       The Antitrust Claims Fail Because UBS Was Not A Silver Fixing Member
            And Plaintiffs Do Not Show That It Otherwise Conspired. .................................. 2

           A.      UBS Had No Role In Setting The Silver Fix Price..................................... 3

           B.      UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress
                Silver Prices. ............................................................................................... 4

    II.      The Commodities Manipulation Claims Fail Because UBS Did Not
            Intentionally Cause The Artificial Silver Fix Price That Allegedly Inflicted
            Injury............................................................................................................................ 9

CONCLUSION............................................................................................................................... 10

i

## TABLE OF AUTHORITIES

Pages

**CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................... 2, 8, 9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................ 1, 2, 3, 5, 8

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991) ................................................................................................ 4

*In re Amaranth Natural Gas Commodities Litig.,*
  730 F.3d 170 (2d Cir. 2013) ......................................................................................... 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
  560 F. App'x 84 (2d Cir. 2014) .................................................................................. 5, 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
  2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
  aff'd, 560 F. App'x 84 (2d Cir. 2014) ...................................................................................... 9

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007) .................................................................................................. 9

*In re Platinum & Palladium Commodities Litig.,*
  828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................................. 5

*Lipsky v. Commw. United Corp.,*
  551 F.2d 887 (2d Cir. 1976) ................................................................................................ 5

*Mayor of Balt. v. Citigroup,*
  709 F.3d 129 (2d Cir. 2013) ...................................................................................... 2, 3, 4, 7

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
  763 F.3d 198 (2d Cir. 2014) ................................................................................................ 4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ....................................................................................................... 4, 6

*Yak v. Bank Brussels Lambert,*
  252 F.3d 127 (2d Cir. 2001) ................................................................................................ 4

TABLE OF AUTHORITIES
(cont'd)

Pages

**STATUTES**

15 U.S.C. § 1 ................................................................................................................................. 2

7 U.S.C. § 1 .................................................................................................................................... 9

7 U.S.C. § 13 .................................................................................................................................. 9

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 2, 4

Fed. R. Civ. P. 8(a)(2) ................................................................................................................... 2

**INTRODUCTION**

The Second Complaint in this purported class action alleges yet again that the members of the Silver Fix panel—which determined a reference price for silver until August 2014—conspired to artificially suppress silver prices for 15 years by setting the Silver Fix price at unduly low levels. The panel members (Defendants Deutsche Bank, HSBC, and Bank of Nova Scotia) allegedly engaged in this artificial-suppression and false-pricing scheme to benefit their investments in certain instruments whose value is derived from the price of physical silver. As Plaintiffs concede, however, ***UBS never participated in the Silver Fix*** with the panel members.

UBS fully concurs with the other Defendants that the Second Complaint should be dismissed under Rule 12 in its entirety as to all Defendants. The allegations as to UBS's conduct also suffer from additional, and even more glaringly fatal, flaws addressed in this separate motion.[1] When the Second Complaint's labels and conclusory allegations are filtered out, as they must be, nothing remains to support an inference that UBS conspired with the Silver Fix panel members to suppress the price of silver. At most, the Second Complaint describes a fleeting period of parallel conduct by UBS and a panel member, which is inadequate under Section 1 of the Sherman Act: "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The Second Complaint attempts to compensate for the lack of factual matter supporting a plausible inference of conspiracy by directing attention to three things: **(1)** UBS's role as a market maker; **(2)** the November 2014 assertions by the Swiss financial regulatory agency about cer-

---

[1] UBS joins Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Co-Defendants' Memo"). The Second Complaint, including Plaintiffs' claims for relief under the Sherman Act, the Commodity Exchange Act, and New York common law, should be dismissed as to all Defendants, and nothing in this separate motion by UBS should be construed otherwise. To avoid needless redundancy, this Memorandum adopts the Background section of the Co-Defendants' Memo.

tain inappropriate conduct by UBS employees that has nothing to do with Plaintiffs' claims; and **(3)** UBS's price quotations on the short-term (spot) market for physical silver on *six* trading days plucked from the nearly 4,000 trading days from the January 1999 start of the Class Period to the end of the Silver Fix.  But none of these things gives rise to a plausible inference that UBS conspired to exploit the Silver Fix.  Nor does the Second Complaint show that UBS intentionally caused the allegedly artificial prices to which Plaintiffs attribute their injuries.  Accordingly, in addition to the fatal insufficiency of the Second Complaint's allegations against all of the Defendants, the claims against UBS in particular remain woefully inadequate and should be dismissed under Rule 12(b)(6).

## ARGUMENT

**I.      The Antitrust Claims Fail Because UBS Was Not A Silver Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired.**

The Second Complaint does not allege facts sufficient to show that Plaintiffs' antitrust claims against UBS have "facial plausibility."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2), 12(b)(6).  Plaintiffs allege that all Defendants engaged in a "combination and conspiracy" in violation of, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1 (Second Complaint, ECF No. 63 ("2C.") ¶¶ 80, 270).  "[C]rucial" to such a claim is "whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2013).  The "plaintiff's job … is to allege enough facts to support the inference that a conspiracy actually existed." *Id.* at 135-36.

Direct allegations of a conspiracy "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id.*  By contrast, "[c]ircumstantial facts" of a conspiracy require *more* than an allegation of "conscious parallelism." *Id.* at 136 (emphasis added); *see Twombly*, 550 U.S. at 556.  The plaintiff must present "additional facts or

2

circumstances," referred to as "plus factors," and those additional "facts must … lead to an inference of conspiracy." *Mayor*, 709 F.3d at 137.  That is, "parallel conduct" allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Here, the Second Complaint does not allege "enough facts to support the inference that a conspiracy actually existed" as to *any* of the Defendants, but it is even more deficient as to UBS, given that UBS was not even a Silver Fix panel member.  The Second Complaint does not present any facts, or any required "plus factor," sufficient to portray UBS as a participant in the purported conspiracy.

**A.      UBS Had No Role In Setting The Silver Fix Price.**

The Silver Fix is at the heart of Plaintiffs' claims.  The Second Complaint's central contention is that "the Fixing Members, as masters of the Silver Fix, exercised complete control over the prices of silver and silver financial instruments during the Class Period," and "us[ed] their dominant position of control over the Silver Fix to cause a dysfunction in silver pricing." 2C.¶¶ 4, 118.  That "control" (2C.¶¶ 100-01), with corresponding "advance knowledge of the Fix price" (2C.¶¶ 7, 11) and "Fix price direction" (2C.¶¶ 177, 183), allegedly enabled Defendants to "dictate[] the price of physical silver and thereby financial instruments tied to the price of physical silver, such as COMEX silver futures" (2C.¶ 272); and "to manipulate the Fix price in the specific direction that benefitted their silver market positions, and to extract additional illicit profits from the trades placed by their own clients and their co-conspirator's clients" (2C.¶ 216).

But UBS concededly was "not a member of the Silver Fixing" (2C.¶ 80) or a "Fixing Member" (2C.¶¶ 1, 96), so even on Plaintiffs' theory, UBS was no "master[] of the Silver Fix" (2C.¶ 4), did not "control" it (2C.¶ 101), and was not poised to "dictate[] the price of physical silver" or financial instruments tied to the Silver Fix (2C.¶ 272).  Nor does the Complaint describe communications between UBS and any Silver Fix panel member during the alleged "per-

3

sistent suppression" (2C.¶ 176) through which any supposed "advance knowledge of the Fix price" and "direction" inherent in Silver Fix panel membership (2C.¶¶ 7, 177) was purportedly conveyed to UBS. Even if the Silver Fix panel members could be treated as having acted in agreement, which they cannot be, nothing would connect UBS to that alleged agreement. The allegations as to the panel members thus cannot state an antitrust claim against UBS.

### B.     UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Silver Prices.

Failing to present facts showing UBS to be a conspirator is a fatal deficiency, and what Plaintiffs *do* allege about UBS does not compensate for that deficiency. The Second Complaint presents three clusters of allegations as to UBS—that **(1)** UBS is a market maker in the silver spot (short-term) market (2C.¶¶ 73, 199);[2] **(2)** the Swiss Financial Market Supervisory Authority ("FINMA") made certain assertions about UBS's conduct as to its clients in precious metals trading in "settl[ing]" a proceeding (*e.g.*, 2C.¶¶ 79, 155-56, 213-14, 220, 242);[3] and **(3)** UBS allegedly quoted prices lower than market averages at intervals "around" the Silver Fix conference call on six trading days (2C.¶¶ 158-66). These allegations do not amount to any valid "plus factor," since they are not "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Mayor*, 709 F.3d at 137. That is, Plaintiffs have not described events showing that UBS engaged in, for example,

---

[2]  "Market Making Members [of the London Bullion Market Association] are required to quote prices to each other upon request throughout the London business day in any combination of the three main product categories—spot, forwards and options—in both gold and silver." LBMA, *A Guide to the London Precious Metals Markets* 3 (2008) (cited at 2C. ¶ 3 n.1). At the Rule 12(b)(6) stage, the court examines the complaint "augmented by … 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001) (court considers document "integral" to complaint even when pleading "[c]arefully avoid[s] all mention" of it when pleaded claims nonetheless depend on its contents) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

[3]  UBS disagrees with the Second Complaint's characterization of the FINMA process, but for purposes of this motion it addresses the facts as pleaded.

4

"parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.

**1. Market Making.** UBS's activities as a market maker—a "dealer[] that … buy[s] and sell[s] silver, at a publicly quoted 'bid' (buy) and 'ask' (sell) price" (2C.¶ 198)—cannot imply unlawful conduct in concert with the Silver Fix Panelists. The Second Complaint offers no basis whatsoever for inferring conspiracy from the mere fact of continuous active participation in a market. As in the commodities context, no "inference of intent" to engage in illicit conduct can be drawn from a firm's status as a major market participant, even where it has market power (which is not alleged here as to UBS). *In re Commodity Exchange, Inc.*, 560 F. App'x 84, 86 (2d Cir. 2014) ("*COMEX II*"). If anything, UBS's market-making role undercuts the averment that UBS had a motive to participate in the alleged scheme, or that there is anything suggestive about UBS's "very large trading position in the precious metals market" (2C.¶ 210). A "persistent suppression of silver prices" (2C.¶ 176) would not have benefitted UBS, given that, as an ordinary market maker, UBS was required to sell as well as to buy physical silver to meet orders in the market, and UBS also held silver (2C.¶ 105).

**2. FINMA Assertions.** FINMA's assertions regarding the alleged "settlement" announced on November 12, 2014 do not implicate UBS in the alleged conspiracy. Those assertions are "not an adjudication of the underlying issues" in Plaintiffs' case, and so Plaintiffs "are … prohibited from relying on the [FINMA statements] to plead the underlying facts of liability." *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011). Nonbinding assertions, including "pleadings, settlements, and government investigations in other cases," should be stricken as "immaterial" under Rule 12(f). *Id.* at 593 (citing *Lipsky v.*

*Commw. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976)).

In any event, the FINMA assertions do not support Plaintiffs' claims.[4]  The FINMA Release selectively quoted in the Second Complaint, and the news coverage of the related FINMA Report, must be viewed in their proper context.  *See Tellabs*, 551 U.S. at 322; *supra* note 3.  The report—which focused mainly on conduct in the foreign exchange market—briefly made assertions about events in precious metals markets in which UBS employees allegedly engaged in "*conduct against the interests of [the bank's] own clients*."  FINMA Report § 3.3.3, at 12 (emphasis added).[5]  FINMA asserted that certain UBS employees had shared the confidential order information of UBS's precious metals trading customers with unnamed "third parties," and also engaged in impermissible "front running"—that is, capitalizing on confidential customer order information to trade on UBS's behalf—including as to "silver fix orders of one client."  *Id.*  But FINMA's report did not allege that the conduct had anything to do with the Silver Fix or that the

---

[4]  Plaintiffs allege that on November 12, 2014, FINMA ordered UBS to pay approximately $139 million "to settle allegations of misconduct arising from its [foreign exchange] and precious metals investigation."  2C.¶ 242; *see* 2C.¶ 79.  FINMA issued that day: (1) a press release, *FINMA sanctions foreign exchange manipulation at UBS* 1 (Nov. 12, 2014) ("FINMA Release"), and (2) a report setting forth FINMA's allegations, *Foreign exchange trading at UBS AG: investigation conducted by FINMA* 2 (Nov. 12, 2014) ("FINMA Report").  *Available at* http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx.  Plaintiffs quote in part two sentences from the FINMA Release.  "Foreign exchange traders," the FINMA Release asserted, "acted unacceptably frequently against the interests of their clients and counterparties.  This conduct was partly coordinated with other banks.'"  FINMA Release at 2.  "In the improper business conduct in foreign exchange and precious metals trading, electronic communication platforms played a key role," the FINMA Release added.  The Second Complaint also refers (2C.¶¶ 12, 155) to a Bloomberg News article that discussed the FINMA report and that quoted FINMA's chief executive officer, Mark Branson, as stating that "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange," and that "[w]e have also seen clear attempts to manipulate fixes in the precious metals markets."  N. Larkin & E. Logutenkova, *UBS Precious Metals Misconduct Found by Finma in FX Probe*, Bloomberg News, Nov. 12, 2014, *at* http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

[5]  Plaintiffs' allegations and characterizations of the FINMA Report are based almost entirely on two sentences from it.  The first sentence reads:  "The conduct and techniques inadmissible from a regulatory perspective were also applied at least in part to PM spot trading—for instance, the following conduct against the interests of [UBS's] own clients: (i) sharing information on order books with third parties (e.g. stop loss orders), (ii) sharing so-called 'flow information' with third parties on large current or imminent orders, (iii) sharing client names with third parties, (iv) front running and (v) triggering stop loss orders."  FINMA Report § 3.3.3, at 12.  The second sentence reads:  "A substantial element of the conspicuous conduct in PM trading was the repeated front running (especially in the back book) of silver fix orders of one client."  *Id.*

"third parties" were Silver Fix panel members, and Plaintiffs do not allege they are UBS customers whose confidential order information potentially was said to have been misused. Plaintiffs' claims hinge on purported "advance knowledge" of the "Fix price" and its "direction" (2C.¶¶ 11, 183), not knowledge about customer orders from a bank lacking "control" over the Silver Fix.

Departing from the FINMA release and report, which lend no support to the conspiracy allegations, the Second Complaint instead refers to a news article describing an alleged assertion of FINMA's Mr. Branson regarding "clear attempts to manipulate fixes in the precious metals markets." 2C.¶¶ 12, 155. But the quotation attributed to Mr. Branson does not even mention silver or name UBS or any alleged co-participants in the supposed "attempts." In any event, nothing in the Second Complaint shows Mr. Branson used "manipulate" to assert that any specific company (let alone UBS in particular) participated in a conspiracy to suppress silver prices via "control" of the Silver Fix as alleged in the Second Complaint. 2C.¶¶ 4, 100-01, 118. Moreover, any such assertion would be inconsistent with the agency's report, which contains no suggestion that UBS had any role in any conspiracy using "advance knowledge" of the Silver Fix price and direction. 2C.¶¶ 11, 183. Mr. Branson's quoted remark thus does not "lead to an inference of conspiracy" as alleged. *Mayor*, 709 F.3d at 137.

Plaintiffs now strain to recast FINMA's assertions about two categories of inappropriate conduct as to clients in precious metals markets—in which certain UBS staff improperly shared client "stop loss order[]" data and "trigger[ed]" such stop loss orders, and also improperly shared "flow information" concerning "large current or imminent orders" (FINMA Report § 3.3.3, at 12)—as pertaining to the Silver Fix. 2C.¶¶ 12, 156, 159, 200, 213, 220, 224-25, 295-96. These allegations are not found in Plaintiffs' prior complaint (ECF No. 34), exposing them as tactical; at any rate, they are meritless. Again, FINMA's assertions did not connect those forms of con-

duct to the Silver Fix, much less to an alleged effort to "control" or exploit "advance knowledge" of the Silver Fix in concert with the Fixing Members, and Plaintiffs' "mere conclusory statements" about the existence of such a connection are inadequate. *Iqbal*, 556 U.S. at 678.[6]

**3. Price Quoting.** Plaintiffs' assertions about UBS's price-quoting activity—now based on portions of six trading days (*i.e.*, less than 0.2% of the alleged conspiracy period)—likewise fail to present a plausible claim. No facts connect Plaintiffs' alleged statistical disparities in silver pricing (2C.¶¶ 125, 133, 157) to unlawful activity by UBS, so Plaintiffs instead direct attention to the trading activity on the specified dates as purported "example[s]" of "spot market activity" by UBS and other Defendants that "caused silver market price trends to reverse direction" (2C.¶ 161). But these are the only such "example[s]" identified in the Second Complaint, out of allegedly 1,900 "reversion days" (2C.¶¶ 157, 161), and beyond labels and conclusions, Plaintiffs again provide no facts showing that the price quotations raise a plausible inference of conspiracy, or even that they are representative of UBS's silver pricing conduct.

The bare submission of purportedly parallel or correlated price quotes in a dynamic market cannot support an inference of conspiracy, absent additional facts showing that such quotes "would *probably not* result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by *an advance understanding* among the parties." *Twombly*, 550 U.S. at 556 n.4 (emphases added); *see also id.* at 557. Here, Plaintiffs offer no non-conclusory grounds for inferring that UBS's price quotes on the six charted days resulted from "an advance understanding" between UBS and Deutsche Bank or any other Defendant. "[S]imi-

---

[6] Also unavailing are new allegations concerning November 2014 UBS settlements with the Commodities Futures Trading Commission ("CFTC") and the U.K. Financial Conduct Authority ("FCA") (2C.¶¶ 13, 213, 221-22, 240), and CFTC and Department of Justice inquiries said to be pending now (2C.¶¶ 16, 235). These unadjudicated assertions should be stricken under Rule 12(f). At any rate, the settled CFTC and FCA matters are inapposite here because they addressed conduct relating to foreign exchange, not silver, and do not support Plaintiffs' conjectured "link" between the distinct markets (2C.¶¶ 214, 240).

8

lar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007). The Second Complaint's "paragraphs describ[ing] … market price fluctuations," coupled with "bald assertions" that the fluctuations are the result of unlawful conduct, thus fall well short of the minimum demanded by Rules 8 and 12. *In re Commodity Exchange, Inc.*, 2012 WL 6700236, *20 (S.D.N.Y. Dec. 21, 2012) ("*COMEX I*"), *aff'd*, *COMEX II*, 560 F. App'x at 86-87.

## II. The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Silver Fix Price That Allegedly Inflicted Injury.

The Second Complaint does not allege facts sufficient to show that Plaintiffs' manipulation claims against UBS have "facial plausibility" under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*—whether based on UBS's primary conduct as a principal (Third and Fourth Claims) or secondary conduct as an alleged aider and abettor (Fifth Claim). *Iqbal*, 556 U.S. at 678. Because the pleading fails to meet Rule 8, it also fails to meet Rule 9.

The CEA "prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the price of any commodity.'" *COMEX I*, 2012 WL 6700236, *10 (quoting 7 U.S.C. § 13). Manipulation is found "where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commods. Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (internal quotation marks omitted); *COMEX II*, 560 F. App'x. at 86-87. In addition to the reasons Plaintiffs' CEA theory fails as to all of the Defendants, it also fails as to UBS for the same reasons that the antitrust conspiracy theory fails. The Silver Fix is the moving force behind the alleged manipulation. 2C.¶¶ 4, 7, 11, 100-01, 118, 177, 183, 216, 272. But no facts alleged support a plausible inference that UBS had any role in that purported scheme.

Plaintiffs thus fail to satisfy at least three of the elements of a CEA manipulation claim as

9

to UBS.  UBS lacked "ability to influence" the Silver Fix outcome even under Plaintiffs' theory, given that UBS did not participate in the Silver Fix.  *Amaranth*, 730 F.3d at 173.  The Second Complaint also fails to show that UBS "[c]aused the artificial prices" alleged or that it "specifically intended to cause" any such price.  *Id.*[7]

Furthermore, "[a]s plaintiffs fail[] to allege a CEA violation, their aiding and abetting claim [is] properly dismissed as well."  *COMEX II*, 560 F. App'x. at 87.  Aiding and abetting "requires knowledge of the primary violation and an intent to assist it," *Amaranth*, 730 F.3d at 183, but no alleged facts support those inferences.  And for the reasons discussed as to the antitrust claim, none of the clusters of allegations concerning UBS's conduct compensates for these deficiencies.  *See COMEX II*, 560 F. App'x. at 86-87 (quoting *Amaranth*, 730 F.3d at 183).

## CONCLUSION

For the foregoing reasons, and the reasons stated in the Co-Defendants' Memo, all claims in the Second Complaint should be dismissed as to UBS.

DATE:  May 29, 2015

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

Joel S. Sanders
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone: (415) 393-8200

Peter Sullivan
Lawrence J. Zweifach
Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000

/s/  Thomas G. Hungar
Thomas G. Hungar
D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
thungar@gibsondunn.com

*Attorneys for Defendant UBS AG*

---

[7]  Moreover, UBS's role as a market maker further undercuts the plausibility of the allegation that it had a motive to suppress prices over a 15-year period.  *Supra*, Point I.B.1.  Plaintiffs' further attempt to plead CEA claims premised on "false or misleading or inaccurate reports" (2C.¶¶ 308, 311) fails as to UBS for all the reasons set forth in the Co-Defendants' Memo and also because UBS was not a Silver Fix panel member.